JAMES BROWN, *et al*, On Behalf of
Themselves and All Others Similarly Situated,

PLAINTIFFS

v.

TAX EASE LIEN SERVICING, LLC, *et al.*,

DEFENDANTS

CIVIL ACTION NO. 3:15-CV-208-
CRS

ELECTRONICALLY FILED

**MEMORANDUM IN SUPPORT OF THE TAX EASE DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

The core premise of each of Plaintiffs' claims is the allegation that certain attorney's fees

and expenses charged by Defendants Tax Ease Lien Servicing, LLC ("TELS") and Tax Ease

Lien Investments 1, LLC ("TELI") are fictitious and cannot be reasonable under Kentucky law.

Evaluating attorney's fees, particularly the reasonableness of fees, is a question of law for the

Court, making this case well-suited for summary judgment on this narrow issue that, if resolved

in favor of Defendants, will dispose of the case. The undisputed facts establish that the fees

charged to Plaintiffs are actual, reasonable, and otherwise lawful, and no additional discovery

will change the result. Accordingly, TELS, TELI, Lien Data Services, LLC ("LDS"), Blue Grass

Abstract, LLC ("BGA"), and Phil Migicovsky (together, the "Tax Ease Defendants") move the

Court to enter summary judgment in their favor on all counts of Plaintiffs' complaint.

**I.  INTRODUCTION**

Plaintiffs dislike the fact that KRS 134.452—a vital component of the third party

purchaser system created by the General Assembly to combat tax delinquency—entitles

purchasers of certificates of delinquency (tax liens) to recover various fees and charges.

Knowing that a direct attack on the statute would fail, they opt for an indirect route. Even

though TELS and TELI have charged the types of fees allowed by KRS 134.452 in amounts deemed reasonable by the statute, Plaintiffs claim that Defendants have formed a RICO enterprise because the fees allegedly are neither actual nor reasonable. According to Plaintiffs, attorneys do not really do any work and instead just send money "back to" TELS and TELI. The entire basis for Plaintiffs' assertion is that attorneys for TELS and TELI hire vendors to perform certain work, and two of those vendors, LDS and BGA, are affiliated with TELS and TELI by ultimate common ownership (even though Plaintiffs concede that they are all separate entities).

The law is clear that "attorney's fees" include the work of non-legal personnel and outside vendors, which are part of an attorney's overall work product and representation of a client. The undisputed facts establish that the legal services performed by Defendants Billy Sherrow, Esq. and Sherrow, Sutherland & Associates, PSC (the "Sherrow Defendants") and Eric Craig, Esq., with assistance of outside vendors such as LDS and BGA, are exactly the kinds of services for which third party purchasers are entitled to be compensated. The undisputed facts also establish that the amounts charged to Plaintiffs are reasonable as a matter of law—a maximum of $79.50 per pre-litigation notice charged to any Plaintiff compared to $175 per notice deemed reasonable by statute, and charges for title-related research and analysis comparable to charges judicially approved for such work ($300–$400 per file). As a matter of law, the services performed and the fees charged do not somehow become fictitious or unreasonable simply because attorneys use outside vendors affiliated with their clients.

For four years, Plaintiffs have tried to come up with support for their position by obtaining tens of thousands of documents and files, receiving responses to more than 100 written discovery requests, and obtaining testimony from more than a dozen depositions in multiple lawsuits (including depositions of Defendant Migicovsky, former manager of the Tax Ease

entities at issue, and Trey Gulledge, Chief Investment Officer of the defendant Tax Ease entities). The undisputed facts drawn from the mountains of discovery produced establish that Plaintiffs' claims have neither factual nor legal support, and no additional discovery will change that reality, making this matter ripe for summary judgment. The Court should enter summary judgment in favor of the Tax Ease Defendants on all remaining counts of the complaint.

## II.   KENTUCKY LAW ENCOURAGES THE PURCHASE OF CERTIFICATES OF DELINQUENCY TO OFFSET THE MILLIONS OF DOLLARS LOST EACH YEAR TO UNPAID PROPERTY TAXES.

To resolve this action, it is necessary to understand the statutory system that Kentucky has established to remedy the significant harms caused by the non-payment of property taxes.

### A.   Property Taxes are the Lifeblood of Counties and Local Governments.

Kentucky counties and local governments depend on property taxes to survive. *See Farmers Nat'l Bank v. Com.*, 486 S.W.3d 872, 875, 882 (Ky. Ct. App. 2015). Without property taxes, schools and other "essential public services" (such as police and fire protection) cannot exist. *See id.* at 875. "[T]ax delinquency impairs our government's ability to maintain a consistent stream of tax revenue, and thus frustrates its ability to fund its endeavors." *Id.*

The General Assembly first provides taxpayers ample opportunity to satisfy their tax obligations. Annual tax bills are mailed by September 15th, discounts are given for prompt payment, and a taxpayer may pay the full amount by the end of the year without paying interest or penalties. *Id.* at 876. After December 31st, an unpaid tax bill begins to accrue interest. *Id.* If the tax bill remains unpaid by April 15th of the year following the assessment, a certificate of delinquency is created, which also serves as a lien on the property at issue. *Id.* The certificate of delinquency includes not only the unpaid tax obligation but statutory interest, penalties, and fees designed to encourage prompt payment and to discourage delinquency. KRS 134.122(2)(d), 134.420(3).

Of course, liens and accrued penalties are not dollars. Some delinquent taxpayers, like Plaintiffs, continue to fail to pay their tax obligations (whatever their individualized reasons for doing so may be). For the county or local government to collect, it would be necessary to pursue collection efforts, possibly even foreclosure on the property. Those efforts would take additional time and resources from government entities already facing lean budgets and substantial lost revenues from the unpaid taxes. And, even the most efficient and effective enforcement efforts could be for naught. The delinquent taxpayer could be judgment proof, and the sale of the property could bring less than is needed to pay even the original amount of the taxes owed.

**B.     The General Assembly Created the Third Party Purchaser System to Combat Tax Delinquency.**

Given the critical need to recover unpaid tax revenues, and the considerable detriments of forcing counties and local governments to try to collect unpaid taxes themselves, Kentucky, like many states, decided to address this problem by allowing private parties to purchase certificates of delinquency (which can first occur between 90 and 135 days from the creation of the certificate of delinquency). *Farmers*, 486 S.W.3d at 876. As explained by the Kentucky Court of Appeals, "To combat tax delinquency, our General Assembly enacted legislation permitting the sale of long-delinquent tax bills, known as 'certificates of delinquency' (tax certificates) to private, third-party purchasers. Third-party purchasers buy these tax certificates, and in doing so, satisfy the tax debt." *Id.* at 875. The third party purchaser system is "essential to sustaining a stable stream of tax revenue." *See id.* The sale of certificates of delinquency is highly-regulated, and third party purchaser must satisfy various registration and compliance requirements simply to be allowed to purchase certificates of delinquency. *See* KRS 134.128.

Third party purchasers pay the counties and local governments the full delinquent amount owed at the time of purchase (including all accrued interest, penalties, and fees). *See* KRS

134.127(1)(b), 134.128. In other words, when a third party purchaser buys a certificate of delinquency, the government entity is made whole with respect to that delinquency. At that point, the governmental entity has received 100% of the unpaid taxes (plus interest, penalties, and fees), and the third party purchaser is out 100% of the funds needed to purchase the certificate of delinquency and assumes 100% of the risks associated with trying to collect.

C. **To Incentivize the Purchase of Certificates of Delinquency, the General Assembly Expressly Permits the Recovery of Various Fees and Charges.**

Just as a county or local government would be forced to incur time, effort, and expense to enforce a certificate of delinquency, third party purchasers must expend substantial time and money to try to collect on the certificates of delinquency that they purchase. A 12% rate of interest may seem facially appealing, but the risks of never collecting a penny while expending time and incurring fees and expenses that may exceed the face value of the certificate would give any reasonable buyer pause. Kentucky's original system offered little protection from such risks, as there was no clear guidance as to what, if anything, a third party purchaser could recover beyond principal and interest. The Kentucky Court of Appeals provided a partial answer in 2005, holding that third party purchasers had a general right to recover attorney's fees in enforcing certificates of delinquency. *See Flag Drilling Co., Inc. v. Erco, Inc.*, 156 S.W.3d 762, 766–67 (Ky. Ct. App. 2005). But, there still were no clear parameters explaining what fees or charges could be included or how much could be charged. This uncertainty led to more problems for purchasers and delinquent taxpayers alike.

In 2007, the General Assembly struck a careful balance to incentivize the purchase of certificates of delinquency to restore vital lost tax revenues while placing limits on how much third party purchasers could recover. Accordingly, to replace the uncertainty created by *Flag Drilling*, the General Assembly spelled out, in detail, what third party purchasers are permitted to

recover, including both the specific types and amounts of recoverable fees and charges. The statute now expressly permits third party purchasers to collect:

(1) the amount paid for the certificate, KRS 134.452(1)(a);

(2) interest on that base amount (12% per annum), KRS 134.452(1)(b);

(3) pre-litigation attorney's fees, "which may include amounts incurred for collection efforts and costs related to notification, processing, research, communication, compliance, legal costs, documentation, and similar expenses," subject to certain limits primarily tied to the amount paid for the certificate at issue, KRS 134.452(1)(c);[1]

(4) an administrative fee "for preparing, recording, and releasing an assignment of the certificate of delinquency in the county clerk's office," currently subject to a cap of $115, KRS 134.452(4);

(5) actual, reasonable attorney's fees and costs associated with litigation efforts to enforce the certificate or protect a certificate involved in litigation (subject to certain caps and considerations), KRS 134.452(3); and

(6) a statutory installment payment processing fee, if the parties enter into a payment plan. KRS 134.452(2).[2]

**D.    The Statutory Fees and Charges are an Essential Component of the Third Party Purchaser System.**

The intent of the statutory system is expressly stated: "The General Assembly recognizes that third-party purchasers play an important role in the delinquent tax collection system, allowing taxing districts to receive needed funds on a timely basis." KRS 134.452(5). Allowing

---

[1] The enumeration of specific types of work included in the scope of "pre-litigation attorney's fees" was first added to the statute in 2012, but there is no indication that the General Assembly intended at that time to change the scope of charges encompassed by the term "pre-litigation attorney's fees" as opposed to merely providing greater clarity.

[2] The statutes relating to third party purchasers have been amended several times since they were enacted in 2007. For ease of discussion, the current version of KRS 134.452 is cited unless otherwise noted.

third party purchasers to collect fees serves at least three legitimate purposes: (1) it increases the overall cost of failing to pay taxes, thus discouraging long-term delinquency; (2) it incentivizes the purchase of certificates of delinquency by third parties, thus furthering Kentucky's interest in ensuring tax compliance; and (3) it allows the Commonwealth and its counties and local governments to avoid incurring the costs of collection efforts. *See Farmers*, 486 S.W.3d at 881–82. "These additional monies provide an incentive for third-party purchasers that our legislature has deemed necessary…." *Bluegrass Tax Lien Bureau, LLC v. Grise*, No. 2015-CA-1889-MR, 2016 Ky. App. Unpub. LEXIS 846, at *10 (Ky. Ct. App. Dec. 16, 2016).

The ability to recover pre-litigation attorney's fees is particularly important given the desire to encourage pre-foreclosure resolution of certificates of delinquency and the extensive statutory pre-litigation notice requirements imposed on third party purchasers. Third party purchasers are required to send a detailed notice to the property owner within fifty days of purchasing a certificate.[3] KRS 134.490(1). Since 2012, third party purchasers have been required to send at least one notice annually until the third party purchaser sends yet another required notice at least forty-five days before commencing a foreclosure action. KRS 134.490(2). As a third party purchaser is not allowed to foreclose for at least one year after purchasing a certificate of delinquency, KRS 134.546(1), the third party purchaser's only choice during the first year is to engage in pre-litigation collection efforts—i.e., sending notices. The notice-driven nature of pre-litigation attorney's fees is underscored by the statutory limitation of $175 "for each notice sent to the delinquent taxpayer" (though this amount may not accrue more often than every ninety days, regardless of how many notices are sent). KRS 134.452(1)(c)(3).

The General Assembly has made clear that both the types and amounts of recoverable

---

[3] When enacted in 2007, KRS 134.452 also imposed a one-time requirement for third party purchasers to send a detailed notice (providing information about the amounts owed and the third party purchaser) to property owners for every certificate of delinquency owned at that time. KRS 134.452(2) (2007).

fees and charges set forth in the statutes are the product of considerable thought and deliberation and are deemed reasonable: "The General Assembly has carefully considered the fees and charges authorized by this section, and has determined that the amounts established are reasonable based on the costs of collection and fees and charges incurred in litigation." KRS 134.452(5). The Kentucky Court of Appeals recently affirmed this legislative declaration of "both the amount and nature of fees it deems presumptively reasonable" and emphasized: "We cannot overstate our relief and our optimism that these amendments [setting forth the fees declared to be reasonable] will make such future controversies easier to decide and unlikely to recur." *Smith v. Tax Ease Lien Investments 1, LLC*, No. 2014-CA-982-MR, 2015 Ky. App. Unpub. LEXIS 799, at *12 (Ky. Ct. App. Nov. 25, 2015); *see also Klas Props., LLC v. Tax Ease Lien Investments 1, LLC*, 407 S.W.3d 564, 567 (Ky. Ct. App. 2013) (holding that the General Assembly has "carefully considered the rights and regulations of third-party purchasers"); *Bluegrass*, 2016 Ky. App. Unpub. LEXIS at *10 (Ky. Ct. App. Dec. 16, 2016) (rejecting attacks on a third party purchaser's business as "ignor[ing] the statutory mandate").

The legislative and judicial endorsements of the system are well-founded. Third party purchasers restored in excess of $100 million in lost tax-related revenues from 2009–2015 alone. *See* Receipts From Third Party Purchasers Tax Sales from 2009 to 2015 Certificates of Delinquency, *available at*: http://revenue.ky.gov/Property/Pages/Third-Party-Purchaser.aspx (last visited March 28, 2017).

## III. STATEMENT OF MATERIAL FACTS

The material facts pertinent to this motion are not in dispute. The dispute lies only in the legal effect of these facts.

### A. Plaintiffs are Delinquent Taxpayers.

Plaintiffs are on one side of the third party purchaser system: as delinquent taxpayers

(serial delinquent taxpayers, in fact), they are the reason Kentucky created the system. This case

began in April 2013 as a putative class action counterclaim in Jefferson Circuit Court filed by

Rose Harper and Deddo Goldsmith after Plaintiffs' counsel recruited them to do so.[4] Soon after,

Phillip and Karyn Julian intervened as additional "counterclaimants" after Plaintiffs' counsel

recruited them. When briefing on the motion to dismiss the counterclaim showed that these

original claimants could not pursue claims for damages since none of them had paid anything

toward their unpaid tax liens, Plaintiffs' counsel found yet another recruit, James Brown, to

intervene in the state court action and join the "counterclaim." In January 2014, the state court

dismissed the claims of Harper, Goldsmith, and the Julians for their lack of injury, and Plaintiffs'

counsel found three more recruits to join the suit: Emil Walther III, Phillip Leigh, and Theresa

Cambron.[5] The state court ultimately realigned the parties to reflect the true litigation posture,

which led to the removal of the realigned case to this Court. Ms. Cambron passed away, and her

estate is represented by Denise Puckett. In January 2017, the Court granted Walther's motion to

voluntarily dismiss his claims. Brown, Puckett, and Leigh are the only Plaintiffs remaining.

### B. The Tax Ease Defendants are Third Party Purchasers and Companies Providing Services In Connection with the Enforcement of Certificates of Delinquency.

The Tax Ease Defendants are on the third party purchaser side of the system. TELS and

TELI are registered third party purchasers that have purchased certificates of delinquency in

Kentucky (TELI since the mid-2000s, TELS a few years later). (*See* Trey Gulledge Depo.,

---

[4] The circumstances of the filing of the original counterclaim remain suspect. Most disturbingly, neither Harper nor Goldsmith recalled suing anyone, much less filing a putative class action. (Harper Depo., excerpts attached as Ex. A, at 43–46; Goldsmith Depo., excerpts attached as Ex. B, at 16–19.) Further, in an apparent violation of prohibitions on in-person solicitation of potential clients, Plaintiffs' counsel found Harper and Goldsmith through a "door-to-door" recruitment effort. Chris Otts, *Suit Claims Abuses By Company That Buys Tax Bills*, THE COURIER-JOURNAL, June 1, 2013, at A1, p.2 (copy attached as Ex. C).

[5] Documents reflecting Plaintiffs' counsel's recruiting of these Plaintiffs are attached collectively as Ex. D.

excerpts attached as Ex. E, at 34; Migicovsky Depo., excerpts attached as Ex. F, at 106–07.[6])

TELI purchased a certificate of delinquency for Brown's unpaid 2004 property taxes. (Brown

Cert. Assignment, attached as Ex. K.) TELI purchased certificates for Cambron's unpaid 2004,

2005, 2006, and 2008 property taxes. (Cambron Cert. Assignments, attached as Ex. L.) TELI

purchased various certificates of delinquency for Leigh's unpaid taxes and unpaid taxes for one

of his companies, though that company is not a party to this action.[7] (Leigh Cert. Assignments,

attached as Ex. M.) LDS provides services to attorneys in connection with enforcing certificates

of delinquency (primarily in the pre-litigation process). *See infra* § III.C. BGA provides title-

related services to foreclosure counsel. *See infra* § III.D. Mr. Migicovsky is a former manager

of TELS, TELI, LDS, and BGA. (Migicovsky Resp. to Int. Nos. 1, 7, attached as Ex. N.) TELS,

TELI, LDS, and BGA ultimately are connected by common ownership, but they are legally

distinct entities serving distinct functions. (*E.g.*, TELS Supp. Resp. to Int. No. 11, excerpts

attached as Ex. O.)

    The Tax Ease family of companies began with an entity making tax loans in Texas, but

the business later expanded to include the purchase and enforcement of tax liens in other states,

including Kentucky. (Migicovsky Depo., at 16–17, 24; Gulledge Depo., at 20.) New entities

were formed to purchase tax liens in different states and to perform other specific functions (e.g.,

Tax Ease Employee Services, LLC, was formed as a staffing entity). (*See, e.g.*, LDS Supp.

Resp. to Int. Nos. 6, 11, excerpts attached as Ex. P.) Distilled to simplest terms, Tax Ease

Holdings, LP (later Tax Ease Holdings, LLC) served as the ultimate holding company for the

---

[6] Mr. Gulledge is the former COO of TELS, TELI, BGA, and LDS, and he generally oversaw and has extensive knowledge of the operations of these entities. (*See* TELS Resp. to Int. No. 23, attached as Ex. G; TELI Resp. to Int. No. 23, attached as Ex. H; LDS Resp. to Int. No. 18, Ex. I; BGA Resp. to Int. No. 18, attached as Ex. J; Migicovsky Depo., at 66, 81, 123; Gulledge Depo., at 38–40, 50.)

[7] TELS purchased certificates of delinquency against properties owned by Plaintiffs who have been dismissed from this action. With the dismissals of these former Plaintiffs, certain claims are no longer pending against TELS, as detailed below.

various entities created over time. (*E.g.*, *id.*, Resp. to Int. No. 11.)

The Tax Ease entities initially experienced many problems with getting liens redeemed in Kentucky, even when they voluntarily tried to reach property owners and get them to pay their delinquent obligations. (*See* Billy Abshier Depo., excerpts attached as Ex. Q, at 26–28.[8]) One significant problem was that county PVA offices often did not have accurate information for property owners, meaning that notices based on that information did not always find the correct recipient. (*See id.* at 26–28, 34–35; *see also* Cathie Abshier Depo., excerpts attached as Ex. R, at 24–26.[9]) Obtaining accurate information often was no easy task (especially with few PVAs online in the early days, and with even online records not always up-to-date). (*See* B. Abshier Depo., at 34–35; C. Abshier Depo., at 24–26.)

Even before the General Assembly overhauled the third party purchaser process in 2007, the Tax Ease entities decided to work on ways to improve their pre-litigation enforcement process. In addition to TELI's sending some notice letters itself (at no charge), it retained Kentucky counsel, Virginia Lawson, Esq., to prepare and send "test" batches of notices to see if this could improve lien redemption rates and to get a sense of what work was involved in the process and what the costs would be. (*See* B. Abshier Depo., at 18–20, 26–29.) TELI provided her certificate information, but Ms. Lawson was fully responsible for identifying current property owner information and for sending all notices, and she charged either $125 or $75 per notice.[10] (*See id.*; C. Abshier Depo., at 26.) Unfortunately, incurring this additional expense and effort

---

[8] Mr. Abshier spearheaded the purchase of certificates of delinquency in Kentucky, came up with the idea to form LDS, and worked with Mr. Sherrow in the latter's role as counsel for TELS and TELI. (*See* B. Abshier Depo., at 9, 25–26, 47–48.)

[9] Mrs. Abshier was a paralegal who assisted in various administrative functions for the Tax Ease entities. (*See* C. Abshier Depo., at 8.)

[10] Mr. Gulledge recalled Ms. Lawson charging $125 per letter, while Mr. Abshier thought it was $75 per letter. (*Compare* Gulledge Depo., at 197–202 *with* B. Abshier Depo., at 21.)

still left many liens un-redeemed and failed to cure the errors found in PVA records and other property-related information.  (*See* C. Abshier Depo., at 26.)

When the General Assembly codified third party purchasers' right to recover pre-litigation attorney's fees, and based on the experience gained from the test batches sent by Ms. Lawson, Tax Ease ownership saw an opportunity for a new type of business.  If they could create a company that could provide improved information-gathering and administrative services for attorneys in the pre-litigation process, this could improve lien redemption rates (benefiting both TELI and delinquent taxpayers by bringing in lien revenue and ending the accrual of interest and fees), and the new company could provide a new and different line of revenue.  (*See* Migicovsky Depo., at 131; B. Abshier Depo., at 24–32.)  As Mr. Abshier made clear, while ownership certainly hoped to earn a profit on a new type of business, it also was a fundamental goal to lower the cost to the delinquent taxpayers by charging lower rates and encouraging redemption through the notice process.  (*See* B. Abshier Depo., at 30–31.)  Thus, LDS was formed as a legally separate entity to provide support services to attorneys representing third party purchasers in the pre-litigation process.[11]  (*See id.* at 30–31, 78–79; *see also* Migicovsky Depo., at 103.)  When TELI, and later TELS, retained Mr. Sherrow to represent them in the pre-litigation process, Mr. Sherrow contracted with LDS to have it perform extensive support functions comparable to those that would be performed by paralegals or other staff or vendors acting under an attorney's supervision.  (*See* Sherrow Engagement Letters, attached as Ex. T, and LDS Vendor Agreement, attached as Ex. U; *see also infra* § III.C for a description of Mr. Sherrow's legal work and LDS's services for Mr. Sherrow.)  After Mr. Sherrow began representing TELI with support from LDS, redemption rates increased.  (*See* C. Abshier Depo., at 26.)

---

[11] The majority of LDS's work was for attorneys representing TELS and TELI, but it performed similar services for at least one other third party purchaser.  (*See* LDS Resp. to State Court Int. No. 5, attached as Ex. S (estimating percentage of LDS's work for attorneys representing TELS and TELI).)

BGA came into existence in a similar fashion. As certificates of delinquency age, it is necessary to foreclose to enforce certificates that remained unpaid. A vital part of any foreclosure action is identifying all those having an interest in the property and ensuring that those individuals and entities are named in the case to require them to assert whatever interest they may have (thus enabling the conveyance of a clean title at any eventual sale of the property). Based on initial experience with some foreclosures, including seeing the adverse results of ineffective title work (e.g., missed liens), Tax Ease ownership realized that there was an opportunity for a business that could provide title services to foreclosure attorneys to facilitate that process. (*See* B. Abshier Depo., at 51–55.) Thus, BGA was formed as a legally separate entity to provide those services. (*See* Gulledge Depo., at 90–92.)

C. **The Sherrow Defendants, with the Assistance of LDS as a Vendor, Provided Extensive Pre-litigation Services to TELS and TELI.**

The Sherrow Defendants (Billy Sherrow, a licensed Kentucky attorney, and his law firm, Sherrow, Sutherland and Associates) represented TELS and TELI by providing pre-litigation (and litigation) services. Mr. Sherrow has been a licensed Kentucky attorney for over forty years. (Sherrow Depo., excerpts attached as Ex. V, at 7–8.) In 2007, he began representing TELI (and, later, TELS) to provide pre-litigation services in light of the new statutory system. (*See id.*at 23–29, 34.) Mr. Sherrow and his firm were responsible for the substantive work and the overall representation of TELS and TELI in the pre-litigation process, and he described the nature of that work at length in his deposition. (*See id.* at 33–38, 45–54, 140–52 and Ex. 26 thereto (an affidavit describing pre-litigation work that Mr. Sherrow discussed in his deposition); *see also* Migicovsky Depo., at 141–45, 148–49 (describing Sherrow's services); B. Abshier Depo., at 35–36, 47–49 (discussing Sherrow's services, collaboration on the drafting and revising of notice letters, and oversight of the notice process).)

Mr. Sherrow first drafted notice letters (more accurately, the templates) to ensure their compliance with KRS 134.452, and he provided an electronic copy of his signature for LDS to insert into each letter. (*See* Sherrow Depo., at 47–51, 78, 85–86.) Plaintiffs claim that Mr. Sherrow did not actually *draft* the letters himself, a fact that Mr. Sherrow disputes. For present purposes, the Court may accept Plaintiffs' characterization as true, as it is clear that Mr. Sherrow at least reviewed and approved the notice templates and that he advised TELS and TELI concerning potential revisions and engaged in other efforts to ensure that all required notices were sent and that they complied with all applicable law. (*See, e.g.*, B. Abshier Depo., at 35–36, 47–49; Gulledge Depo., at 229–30; Migicovsky Depo., at 141–43.) Mr. Sherrow also retained LDS to "do the research and the mailing of the letters, manage the data…[and] handle the actual mailing of the letters." (Sherrow Depo., at 31–32; *see also* Migicovsky Depo., at 142–43.) But, as succinctly explained by Mr. Sherrow, "We basically serviced the business generated by those letters." (Sherrow Depo., at 36–37.) Mr. Sherrow bore ultimate responsibility for the letters and the pre-litigation process. (*See* Gulledge Depo., at 229–30.)

Mr. Sherrow's representation of TELS and TELI went well beyond drafting or approving letters and encompassed all aspects of the work connected to the pre-litigation process. (*See* Sherrow Depo., at 51–54; *see also, e.g.*, *id.* at 33–38, 45–46, 140–52.) TELS or TELI would place an order with Mr. Sherrow, who directed LDS to send letters for the requested batch. (*Id.* at 64–66; *see also* Andrea Russolillo Depo., excerpts attached as Ex. W, at 22, 47–48, 50–51, 58; B. Abshier Depo., at 43–44.[12]) Mr. Sherrow directed and oversaw LDS's work, as any attorney does, whether engaging an outside vendor or using the services of an in-house paralegal or staff. (*See, e.g.*, Sherrow Depo., at 151–53; Russolillo Depo., at 57–58; B. Abshier Depo., at 35–36,

---

[12] Ms. Russolillo was a manager for LDS and other Tax Ease entities who oversaw various aspects of the companies' operations. (*See* Russolillo Depo., at 13–17.)

43–44.)  Mr. Sherrow was expected to audit and evaluate work performed by LDS, and he did so, occasionally contacting LDS with feedback, rejecting certain batches, or otherwise requiring corrections.  (*See* B. Abshier Depo., at 35–36.)

In addition to bearing responsibility for the notices and supervising LDS, Mr. Sherrow and his firm handled sometimes extensive follow-up phone calls and correspondence and otherwise managed the entire pre-litigation process.  (*See* Sherrow Depo., at 51–54; *see also, e.g.*, *id.* at 33–38, 45–46, 140–41, 146–49 (discussing specific example of additional work on one file), 151–52 and portions of Ex. 27 thereto (sample follow-up correspondence regarding certificates of delinquency).)  Mr. Sherrow even had to hire additional employees to handle the volume of work generated by the pre-litigation process.  (*Id.* at 33–35.)  All of this is consistent with the expectations of both the attorney and clients that Mr. Sherrow would be responsible, as counsel, for the pre-litigation process.  (*See* Sherrow Depo., at 36–37; Gulledge Depo., at 229–30.)

As in most representations, Mr. Sherrow and the other attorneys at his firm did not perform every aspect of the overall legal work.  Instead of hiring even more paralegals and other staff to assist him in providing the extensive pre-litigation legal work for his clients, Mr. Sherrow retained an outside vendor, LDS, to perform functions that were vital to the overall representation.  (Sherrow Depo., at 31–32; Migicovsky Depo., at 142–43.)  That work, as with any work by in-house paralegals or staff, was subsumed into Mr. Sherrow's final work product for TELS and TELI, namely, representing TELS and TELI in all aspects of the pre-litigation process, specifically including the notice process.  (*See, e.g.*, Sherrow Depo., at 33–38, 45–46, 51–54, 140–52; Gulledge Depo., at 229—30; B. Abshier Depo., at 35–36, 43–44.)

LDS performed substantial work for Mr. Sherrow to support the fees that it charged to

Mr. Sherrow, including: (1) obtaining (and often deciphering) PVA information; (2) categorizing and compiling property information; (3) performing extensive data entry and management in connection with each lien; (4) preparing and comparing spreadsheets of property and property owner data; (5) conducting research associated with correlating property information if a county changed its recording system; (6) performing mail merges to populate data fields in the notices; and (7) obtaining post office firm books and other information to ensure a record of proof of mailing.[13] (Russolillo Depo., at 19–24, 75–80 (describing procedures followed by LDS).)  LDS also worked on more convoluted files in the aptly-named "black hole" (which contained files for which tracking owner and other information was particularly difficult) to obtain accurate property information to facilitate the notice process.  (*See id.* at 63–64.)  LDS worked for Mr. Sherrow every day to complete these tasks.  (*Id.* at 56.)

D.     **BGA Assisted the Sherrow Defendants, Defendant Craig, and Other Attorneys Representing TELS and TELI In the Foreclosure Process.**

In a perfect world, there would be no delinquent taxes and no certificates of delinquency. In a slightly less perfect world, the pre-litigation process would always result in the redemption of a certificate of delinquency, saving everyone time, effort, and money.  In the real world, notice letters and associated enforcement efforts often prove no more effective than the laws requiring property owners to pay taxes or the statutory interest and penalties imposed to discourage the failure to pay taxes.  Thus, in some cases, it is necessary to file a foreclosure action to enforce a certificate of delinquency.  To do so, it is critical for the foreclosing party to identify everyone who has an interest in the property and to name all of those interested parties as defendants in the foreclosure action.  This is BGA's role.

---

[13] LDS also would provide similar services in performing research and updates for counsel for TELS and TELI to use when pursuing foreclosure actions.  (*See* Russolillo Depo., at 65–66, 68–69; Gulledge Depo., at 263–64; TELS Resp. to Int. No. 17; TELI Resp. to Int. No. 17; LDS Resp. to Int. No. 17.)

The Sherrow Defendants and Mr. Craig (like Mr. Sherrow, a licensed Kentucky attorney), as well as a number of other lawyers and law firms, have represented TELS and TELI in foreclosing on unpaid certificates of delinquency. BGA provided title work to these attorneys (though attorneys used other title vendors as well). BGA performed extensive work to generate title reports and vet title on behalf of foreclosure counsel, with the goal of delivering all relevant information the attorney would need to foreclose in an electronic format that the attorney could easily merge into his own foreclosure documents to enable the attorney to file lawsuits more quickly, easily, and efficiently. (*See* BGA Resp. to Int. Nos. 14, 15, Ex. J; Larry Evans Depo., excerpts attached as Ex. X, at 102–06, 121–22; Migicovsky Depo., at 196–97, 202–03; Gulledge Depo., at 90–92; B. Abshier Depo., at 51–55; Nicole Compary Depo., excerpts attached as Ex. Y, at 14–16.[14]) BGA interviewed counsel to determine what would be helpful to them in representing their clients in foreclosures, developed the form for a summary report based on those interviews and its own analysis, and located and established a network of title abstractors to compile the raw data for BGA's final title reports. (*See* Compary Depo., at 8–12.)

After interviewing counsel, creating templates, and establishing a network of abstractors, BGA's day-to-day work included: (1) conducting county records/PVA research; (2) verifying the property information (e.g., comparing information on the tax bill to information from PVA records); (3) examining the chain of title; (4) determining the proper legal description for the property; (5) identifying current property owners; (6) searching for the current owner's contact information; (7) identifying any relevant delinquent tax liens; (8) identifying any current tax lien holders and verifying any tax lien assignments; (9) searching for tax lien holder contact information; (10) verifying information for any mortgages and junior liens; (11) identifying

---

[14] Mr. Evans is a former operations manager of BGA who oversaw that business. (*See* Evans Depo., at 16, 20, 22.) Mrs. Compary is a former BGA manager who reported to Mr. Evans. (*See* Compary Depo., at 7.)

relevant mortgages; (12) identifying the properties included in mortgages and assignments; (13) identifying current mortgage holders; (14) identifying relevant junior lienholders; (15) searching for junior lienholder contact information; (16) conducting any necessary research on inactive, obscured, or merged entities; (17) obtaining title opinions when needed; (18) reviewing information on relevant legal documents (e.g., *lis pendens*, affidavits, powers of attorney, and easements); (19) reviewing probate records; (20) searching for contact information for heirs; (21) searching divorce and marriage licenses; (22) requesting additional information to establish ownership (30+ years); (23) requesting additional searches for multiple owners; (24) requesting additional searches in multiple counties for border properties; (25) requesting additional documents such as plats or archived records; and (26) requesting additional mobile home searches. (*See* BGA Resp. to Int. Nos. 14–15; Evans Depo., at 102–06, 121–22; Gulledge Depo., at 97–100; Company Depo., at 14–15.) BGA also provided information to foreclosure counsel to identify and facilitate contact with anyone having interest in the property at issue. (*See* BGA Resp. to Int. Nos. 14–15; Evans Depo., at 102–06, 121–22; Gulledge Depo., at 97–100; Company Depo., at 14–15.) For example, BGA would obtain and provide service of process information for mortgage holders, often via a screenshot of the Secretary of State page and in an electronic format that the attorney could merge into the foreclosure documents. (*See* BGA Resp. to Int. Nos. 14–15; Evans Depo., at 102–06, 121–22; Gulledge Depo., at 97–100; Company Depo., at 14–15.) For each file, BGA prepared a summary and analysis of the information for the attorney, and BGA performed whatever other services the attorney required in a given case to evaluate and analyze the title work. (*See* BGA Resp. to Int. Nos. 14–15; Evans Depo., at 102–06, 121–22; Gulledge Depo., at 97–100; Company Depo., at 14–15.)

To perform its work, employees working solely for BGA worked full-time handling

hundreds of files per month.  (*See* Compary Depo., at 17–18, 37.)  BGA also retained its own

vendors to perform certain work, in particular, abstractors who would pull documents from the

public records.  (*See* BGA Resp. to Int. Nos. 14 and 15; Evans Depo., at 102–06.)  BGA

managed and coordinated all such work and interfaced with the abstractors to resolve any

discrepancies or questions, to obtain additional information, and otherwise ensure that the report

BGA compiled for the attorney was complete and accurate.  (*See* BGA Resp. to Int. Nos. 14 and

15; Evans Depo., at 102–06; Compary Depo., at 14–16, 33–35; Gulledge Depo., at 97–98.)

BGA paid varying fees to the abstractors for their services.  (*See* BGA Resp. to Int. Nos. 14 and

15; Evans Depo., at 102–06.)  As Mr. Evans explained, its vendors provided the ingredients for

the cake (the data), and BGA baked the cake (producing the user-friendly, revised, updated, fully

vetted report and summary).  (Evans Depo., at 102.)

Plaintiffs claim that BGA vendors actually do all of the work and that BGA simply added

an arbitrary charge.  The so-called support for that assertion is Plaintiffs' presentation of a BGA

summary sheet to an employee of a BGA vendor at a deposition, where counsel asked the

witness to confirm that his company did work reflected in the line items.  (*See* Nathan Miller

Depo., excerpts attached as Ex. Z, at 60–61.)  But, this summary sheet dealt with property owned

by *dismissed* Plaintiffs Harper and Goldsmith, not a *current* Plaintiff.  (*See id.* at 60.)  Mr. Miller

also testified that he had never before seen the document, and that he did not, in fact, know

anything about what BGA did or what work BGA was intending to describe in each line item.

(*See id.*, at 63–66.)  Notably, he also testified to his knowledge that, *in some cases*, BGA had his

company vet title in addition to performing the initial title search, but that BGA *did its own*

*vetting of title* (beyond what his company did) in many cases.  (*See id.* at 68.)  He testified that

his company quit vetting title altogether for BGA because of how time-consuming and expensive

the process was, making it unprofitable for his company to perform that additional work.  (*See id.* at 65–69.)  As Mr. Miller explained to Plaintiffs' counsel in an email produced only recently (and only in response to Judge Whalin's Order granting the Tax Ease Defendants' motion to compel), title work associated with tax liens is some of the most complicated title work to perform.  (*See* N. Miller email to J. Dwyer, attached as Ex. AA.)  Mr. Miller's company always tried to increase its fees because of that, but BGA always worked to keep the pricing down.  (*See id.*)  The time-consuming, expensive work that Mr. Miller's company largely refused to perform due to its unprofitability is exactly what BGA performed as *one part* of its overall services, as described in detail above.

## IV.    ARGUMENT

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).  The test is whether the party with the burden of proof has presented a jury question as to each element.  *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  To defeat a motion for summary judgment, the plaintiff cannot rely upon the assertions in his pleadings; rather, the plaintiff must come forward with probative evidence to support his claims.  *See Celotex,* 477 U.S. at 324.  Moreover, the plaintiff must present more than a mere scintilla of evidence supporting his position—he must present evidence on which the trier of fact could reasonably find for him.  *Hartsel*, 87 F.3d at 799 (citation omitted).  "[T]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate."  *Hill v. White*, 190 F.3d 427, 431 (6th Cir.

1999) (citations omitted).

### A. Summary of Claims.

Despite legislative and judicial endorsement of the third party purchaser system, Plaintiffs accuse Defendants of committing a host of wrongs because TELS and TELI charge the very fees allowed by KRS 134.452, within the limits deemed reasonable by the statute. Plaintiffs assert violations of RICO and the Kentucky Consumer Protection Act, they assert a claim for relief under KRS 446.070 (providing a right of action to one injured by the violation of another statute), and they assert claims for fraud, fraudulent inducement, and unjust enrichment.[15]

While the specific elements of Plaintiffs' causes of action differ, each is premised on the allegation that any fees attributable to vendors such as LDS and BGA are not real fees. Without the false prop that the fees at issue are fictitious, all of Plaintiffs' claims fail as a matter of law. If the fees and charges set forth in correspondence to Plaintiffs are not fictitious, then there is no misrepresentation to support a claim under RICO (which, here, is premised on mail fraud), or to support a claim for fraud or fraudulent inducement. *See Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012) (requiring proof of a scheme to defraud to support a RICO claim based on mail fraud); *UPS v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999) (requiring a material misrepresentation of fact to support a claim for fraud). Plaintiffs cannot possibly show that there is anything unfair, false, misleading, or deceptive about charging actual, reasonable fees permitted by statute, which defeats any possible KCPA claim. *See* KRS 367.170(1). So, too, must Plaintiffs' KRS 446.070 claim fail if the fees charged are permitted by KRS 134.452.

---

[15] Plaintiffs also originally asserted claims for "injunctive relief" and a declaration of rights. The Court dismissed the "injunctive relief" claim because an injunction is a remedy, not a cause of action. (11/20/15 Op.) With the voluntary dismissal of Walther's claims, there is no longer a claim for a declaration of rights, as the Court previously dismissed every other plaintiff's claim for a declaration of rights. (*Id.*) Additionally, Walther's dismissal leaves no claims for fraud, fraudulent inducement, or violations of the KCPA against TELS, as those claims were dismissed as to TELS with respect to all other Plaintiffs. (*Id.*) The Court also previously dismissed all fraud, fraudulent inducement, KCPA, and KRS 446.070 claims against Mr. Migicovsky. (*Id.*)

*See* KRS 446.070 (requiring an injury caused by violation of another statute to support a claim). Finally, no Defendant can have obtained an unjust benefit at any Plaintiff's expense if the charges collected by TELS and TELI are permissible. *See Furlong Dev. Co., LLC v. Georgetown-Scott County Planning and Zoning Comm'n*, 504 S.W.3d 34, 39–40 (Ky. 2016) (listing elements of unjust enrichment).

The undisputed facts prove that the premises on which this case rests are untrue. As a matter of law, TELS and TELI are entitled to collect pre-litigation and litigation-related attorney's fees and costs, and the facts establish that ample work went into the fees at issue. *Infra* § IV.B. As a matter of law, an attorney's fee includes not only work literally performed by the attorney, but instead must include all of the work that goes into the attorney's final work product and overall representation of the client, including services performed by the attorney's in-house staff or outside vendors. *Infra* § IV.C–D. The facts show that both LDS and BGA performed actual, extensive work on behalf of attorneys representing TELS and TELI to support the overall fees charged. *Id.* Finally, there is nothing unlawful about the use of a vendor affiliated with the client, and the facts establish that LDS and BGA provided valuable services to counsel for TELS and TELI that aided the enforcement of certificates of delinquency in the pre-litigation and litigation processes. *Infra* § IV.E.

> **B.     As a Matter of Kentucky Statutory Law, TELS and TELI are Entitled to Recover the Types of Fees and Charges at Issue, In the Amounts Charged.**

This litigation involves the right to collect pre-litigation attorney's fees and litigation attorney's fees and expenses. TELS and TELI have the unambiguous right to collect these fees, and to do so in amounts that KRS 134.452 expressly permits.

> **1.     *Pre-Litigation Attorney's Fees are for Pre-Litigation Work Allowed by Statute and are In Amounts Substantially Less Than Allowed by Statute.***

It is undisputed that TELS and TELI can collect pre-litigation attorney's fees under KRS

134.452(1)(c).  By statute, pre-litigation fees "may include amounts incurred for collection efforts and costs related to notification, processing, research, communication, compliance, legal costs, documentation, and similar expenses."  *Id.*  Total pre-litigation fees are capped at certain amounts based on the face amount of the certificate and the number of certificates held against a single property.  *Id.*  The 2012 amendments to KRS 134.452 clarify that, unless the face amount of the certificate is $175 or less, pre-litigation fees may not be accrued all at once, but instead may be accrued in increments of up to $175 "for each notice sent to the delinquent taxpayer" (though this amount may not accrue more often than every ninety days, regardless of how many notices are sent).  KRS 134.452(1)(c)(3).

Plaintiffs have argued, and the Court initially agreed in addressing the Sherrow Defendants' motion to dismiss, that fees are not automatically reasonable simply because they fall within the statutory limits.  But, the Court did not have the benefit of the Kentucky Court of Appeals' subsequent interpretation of that very issue or the interpretation of KRS 134.452 by the Kentucky Department of Revenue, the administrative body tasked with implementing and managing the third party purchaser system.  The Kentucky Court of Appeals has held that fees within the limits set forth in the statute are *presumptively reasonable*.  *See Smith*, 2015 Ky. App. Unpub. LEXIS at *12 (recognizing the legislative declaration of "both the amount and nature of fees it deems presumptively reasonable" and stating: "We cannot overstate our relief and our optimism that these amendments [setting forth the fees declared to be reasonable] will make such future controversies easier to decide and unlikely to recur.").  The Department of Revenue agrees that fees up to $175 per notice are inherently reasonable under the terms of the statute.  *See* Basic Information for Potential Third Party Purchasers, p.12, available at

http://revenue.ky.gov/Property/Pages/Third-Party-Purchaser.aspx (last visited March 28, 2017)

(stating in relevant part that "these fees are added in $175 increments—up to the maximum amount allowed—for each notice that is sent to the delinquent taxpayer, but additional amounts cannot be added any more frequently than quarterly no matter how many notices are sent").  The Kentucky Court of Appeals also has since emphasized the "statutory mandate" found in KRS 134.452 and held that "[t]hese additional monies provide an incentive for third-party purchasers and our legislature has deemed necessary…." *Bluegrass*, *supra*, 2016 Ky. App. Unpub. LEXIS at *10.  While it may be possible in a particular case to rebut the presumption of reasonableness (e.g., by showing that a third party purchaser charged for a notice but never sent it—something that Plaintiffs do not claim here, instead relying on generalized attacks on the overall fees), this Court should follow the interpretation of the Kentucky Court of Appeals and the Department of Revenue in concluding that fees within the statutory limits are deemed reasonable by statute.

It is undisputed that the fees charged by Mr. Sherrow for pre-litigation work are within the limits KRS 134.452 deems reasonable.  At different points in time, Mr. Sherrow charged $67.50–$79.50 per notice (with no Plaintiff being charged more than $79.50 for any notice). (*See, e.g.*, TELI Resp. to Int. No. 19.)  This fee encompassed *all* of Mr. Sherrow's pre-litigation work, including but not limited to drafting and updating the template notices (or, at a minimum, approving them and taking professional responsibility for their contents and compliance with the law), ensuring that notices were delivered, and handling whatever follow-up might be needed with respect to a particular notice (fielding phone calls, corresponding with particular delinquent taxpayers or their attorneys, corresponding with other interested parties such as mortgage holders, and otherwise doing whatever was necessary to attempt to redeem the certificate). *Supra* § III.C.  These are the exact types of services described in KRS 134.452(1)(c), and the

highest per-notice charge ($79.50) is less than half of the $175 per notice allowed by statute.[16] Even in the absence of a statutory presumption of reasonableness, Mr. Sherrow's fees are reasonable under any standard.

Plaintiffs seem to take issue with Mr. Sherrow's use of a flat fee per notice instead of billing for specific amounts of time spent on specific files. Flat fees like those used by Mr. Sherrow are particularly beneficial in routine, volume-based matters like the pre-litigation process, providing predictability of costs and avoiding the need for time-consuming itemized billing, among other benefits. *See, e.g., Beck v. Codilis & Stawiarski, P.A.*, No. 4:99-cv-485-RH, 2000 U.S. Dist. LEXIS 22440, at *4–17 (N.D. Fla. Dec. 27, 2000) (holding that flat-rate attorney's fees, as well as associated title search fees and flat fees for certain expenses, were reasonable as a matter of law); *In re: Pineloch Enterprises, Inc.*, 192 B.R. 675, 678 (Bankr. Ct. E.D.N.C. 1996) (discussing benefits of flat fees). Fees comparable to Mr. Sherrow's have been upheld for the sending of collection letters (with no indication that the attorney performed any work beyond sending the letters). *See In re: Ocwen Fed. Bank FSB Mortg. Serv. Litig.*, MDL No. 1604, 2005 U.S. Dist. LEXIS 8274, at *3, 5, 15–17 (N.D. Ill. April 25, 2005) (holding that fees of $285 per homeowner—or $95 per form letter—were recoverable under a provision permitting the recovery of reasonable attorney's fees). And, Kentucky state courts and federal bankruptcy courts have allowed per-notice fees for other third party purchasers in greater amounts than charged by Mr. Sherrow. (*See, e.g.*, Sample Orders attached as Ex. BB.) Plaintiffs offer no reason to disallow the statutorily-reasonable fees charged to them.

---

[16] TELS and TELI occasionally sent additional notices beyond the quarterly notices, but they did not charge delinquent taxpayers for these notices. (*See, e.g.*, Gulledge Depo., at 268–69.) Whenever Mr. Sherrow sent a notice that would result in fees greater than the statutory cap for a particular certificate, he was still paid in full by TELS or TELI, even though that fee would be unrecoverable from the delinquent taxpayer. (Sherrow Depo., at 137–38.)

## 2. *BGA Title Fees are Litigation Fees and Costs Permitted by Statute.*

KRS 134.452(3) expressly allows TELS and TELI to recover litigation related attorney's fees and costs. These fees necessarily include vendor expenses that are incurred to advance the litigation. *See Dowdell v. Apopka*, 698 F.2d 1181, 1190 (11th Cir. 1983) (fees and expenses are "inseparably intertwined as equally vital components of the costs of litigation"); *Wheeler v. Durham City Bd. Of Educ.*, 585 F.2d 618, 623–24 (4th Cir. 1978) (expenses are "integrally related to the work of an attorney" and can "play a significant role in the ultimate success of litigation").

Good title work is a necessary component of any foreclosure action, as it is critical for the plaintiff to identify and name as defendants all those who might have an interest in the property. *See Beck*, 2000 U.S. Dist. LEXIS at *10–11. BGA provided that work at an average cost of $300 or $400 per file, which included the cost of BGA's vendors (the title abstractors who physically pulled documents from the public record and compiled them) and the costs associated with BGA's own work.[17] (*See* BGA Resp. to Int. No. 3; Evans Depo., at 102.) BGA's work includes: (1) analyzing the information produced by the abstractor; (2) working with the abstractor or otherwise acting to resolve discrepancies or questions about the information provided; (3) ensuring that all information was put into a user-friendly form for counsel; (4) answering any questions counsel might have; (5) obtaining service of process and other information for those having interests in the property; and (6) any other work that would be helpful to foreclosure counsel. *Supra* § III.D. The charge of $300 or $400 per file is comparable to the average charge of $300 per file at issue in *Beck*, which the court held to be reasonable. *See*

---

[17] Brown and Cambron were charged $300 and $400, respectively, for title work. (*See* Cambron Title Package, Ex. CC; Brown Title Package, Ex. DD. As reflected in the Leigh Payoff, Ex. EE, it appears he was not charged for title work in connection with the only certificate of delinquency referenced in the complaint that applies to him, rather than to his company. Leigh has no standing to sue for charges to his company. *Turner v. Andrew*, 413 S.W.3d 272, 275–77 (Ky. 2013).

2000 U.S. Dist. LEXIS at *10–11.  And, as the best evidence of the reasonableness of the $300–400 title search fees, they have been approved many times by the Kentucky courts called upon to evaluate their reasonableness, including in cases in which title fees were fiercely contested and in which the court reduced other fees being sought.  (*See* Example Cases attached as Exs. FF and GG.)

Plaintiffs assert that BGA should not have been allowed to charge a penny more than it paid to the abstractors, but this disregards the work that BGA performed in addition to the data gathering by the abstractors.  *See Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 661–62 (8th Cir. 2012) (rejecting the plaintiffs' artificial focus on only one component of the appraisal process in claiming that the fees were excessive).  There is no support for the argument that a vendor's (or anyone else's) charges can be limited to its out-of-pocket expenses without accounting for the vendor's own work and profit.  *See Beck*, 2000 U.S. Dist. LEXIS at *15–16 (rejecting a similar argument that title fees should be limited to out-of-pocket expenses or the vendor's raw costs).

C.      **TELS and TELI are Entitled to Recover "Attorney's Fees" Even if Components of the Work are Performed by Non-Lawyers.**

As set forth above, Mr. Sherrow's fees are recoverable as attorney's fees.  Apparently, though, Plaintiffs believe that attorney's fees cannot be attorney's fees if the attorney does not personally perform every aspect of the work himself.  Plaintiffs are wrong.

"Clearly, a 'reasonable attorney's fee' cannot have been meant to compensate only work performed personally by members of the bar.  Rather, the term must refer to a reasonable fee for the work product of an attorney." *Mo. v. Jenkins*, 491 U.S. 274, 285 (1989).  "Thus, the fee must take into account the work not only of attorneys, but also of secretaries, messengers, librarians, janitors, and others whose labor contributes to the work product for which an attorney bills her

client; and it must also take account of other expenses and profit." *Id.* This non-lawyer work may be factored into the attorney's rate, or, in some cases (e.g., paralegal work), it can be billed separately. *See id.* at 286–87. Overhead expenses are accounted for as part of the attorney's rate. *See Bobrow Palumbo Sales, Inc. v. Broan-Nutone, LLC*, 549 F. Supp. 2d 274, 288 (E.D.N.Y. 2008). Other expenses, including vendor fees, can be itemized, but they still are recoverable as part of the attorney's fees. *See id.* at 285–87 (collecting cases and discussing charges for copies, telephone, travel, court fees, fax services, transcripts, messenger services, and process servers as being recoverable components of an attorney's fee award). Attorney's fees thus include reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to clients. *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998) (quotation omitted, citing various cases discussing proper components of an attorney's fee award under laws permitting fee awards); *Lentz v. Morgan Drexen, Inc.*, 2015 U.S. Dist. LEXIS 96855, at *9–10 (S.D. Miss. July 24, 2015) (adopting bankruptcy court's conclusion that there is no requirement for an attorney personally to perform every service and permitting outsourcing to staff and third parties).

The term "attorney's fees" (the term at issue in KRS 134.452) encompasses not only the work literally done by the lawyer, but the overall work product generated by the attorney, staff, vendors, and other expense items. Some items can be, but are not required to be, billed separately (e.g., paralegal work). Others (e.g., overhead) must be built into the attorney's rate. But, they all are recoverable in some form or fashion. Indeed, KRS 134.452 makes clear that the term "attorney's fees" is to be interpreted broadly by providing a non-exclusive list of the types of work included in the scope of the statute and making express references to costs. KRS 134.452(1)(c)(1) (fees "may include amounts incurred for collection efforts and costs related to

notification, processing, research, communication, compliance, legal costs, documentation, and similar expenses"). Therefore, Plaintiffs cannot claim that Mr. Sherrow's fees are not actual or are unreasonable simply because he and other attorneys in his firm did not personally do everything. *Cf.* KRE 503(b) (providing that privilege attaches to communications with representatives of the lawyer, recognizing that non-lawyers are an inherent part of the attorney's representation of his client). As a matter of law, Sherrow's fees properly include all work performed by both attorneys and non-attorneys that ultimately went into Mr. Sherrow's work product, i.e., the pre-litigation notice and collection process.

**D.  TELS and TELI are Entitled to Recover "Attorney's Fees" Even if Mr. Sherrow Outsources Components of the Work to a Third Party.**

Attorney's fees do not cease to be fees simply because an attorney outsources work to a third party vendor rather than having all of that work done in-house at his firm. Just as delegating work to in-house paralegals and other staff is a well-established means of providing more efficient, cost-effective legal services, outsourcing such services to third parties is an appropriate and effective means of accomplishing similar results. "Outsourcing affords lawyers the ability to reduce their costs and often the cost to the client to the extent that the individuals or entities providing the outsourced services can do so at lower rates than the lawyer's own staff." ABA Formal Opinion 08-451, p.2, Ex. HH. Outsourcing also enables lawyers who might lack staffing to perform larger scale work to perform that work. *Id.* Outsourcing is extremely common and legally permissible. *See id.* at 2–3, *see also* Va. Legal Ethics Op. 1850, at 4, Ex. II ("Lawyers frequently hire contract lawyers and nonlawyers alike to do legal research, document preparation, or document review. … In none of these circumstances does contracting for such services constitute aiding the unauthorized practice of law, provided there is adequate supervision by the lawyer."). The lawyer's responsibility when outsourcing (or delegating work

to any non-lawyer) is to supervise the work, bear ultimate responsibility for it, and incorporate it into his final work product as part of fulfilling his own duty to provide competent representation. *See* ABA Op., at 2–3; Va. Op., at 4.

Mr. Sherrow had the right to hire vendors to assist him in the pre-litigation process and to account for that work in his fee. Instead of billing by the hour or separately charging for vendor fees, Mr. Sherrow charged a flat fee per notice, with that fee encompassing all of the pre-litigation time and expense that the Sherrow firm would incur, as well as the costs associated with LDS. There is nothing unlawful about any of this. Indeed, the fees that were made possible through the combined efforts of Mr. Sherrow and LDS were *lower* than the fees that Ms. Lawson charged to TELI for performing the same kinds of work herself without LDS, and the redemption rates for certificates of delinquency increased after the retention of Mr. Sherrow and his hiring of LDS. (*See* B. Abshier Depo., at 24–32; C. Abshier Depo., at 26.) The fees were also lower than those charged by other third party purchasers and approved by courts evaluating those fees. (*See, e.g.*, Sample Orders, Ex. BB; Gulledge Depo., at 141–44.)

Perhaps stymied by the unwavering line of authorities supporting the use of outsourcing, Plaintiffs have focused heavily on the amount paid by Mr. Sherrow to LDS in comparison to the amount he charged TELS and TELI. According to Plaintiffs, if Mr. Sherrow's net gain was only a small portion of the overall fees charged, with a larger amount of money going to his vendors, his fees are unlawful. The profitability of the attorney's work product for the attorney has nothing to do with the attorney's right to be compensated for the total body of work. Anything Mr. Sherrow pays to a vendor cuts into his own revenue. The same is true of whatever Mr. Sherrow pays his staff or pays for other overhead expenses. The question is whether the fee itself is reasonable for the total work performed, not how much the attorney profited from the

work or how much work the attorney performed himself as opposed to work performed by paralegals, staff, or vendors.

In re: Thorne, 471 B.R. 496 (N.D. Miss. Bankr. 2012) is instructive in refuting Plaintiffs' profitability argument. *Thorne* involved a host of claims based on the premise that the defendants unlawfully split legal fees and engaged in the unauthorized practice of law. *Id.* at 499. The defendant law firm (J&F) invoiced its client $800, was allowed $600 of that fee by the court, and paid $506.96 of the allowed $600 to a third party (Prommis, which was not a law firm) for "paralegal and support services." *Id.* at 500. J&F and Prommis had close ties. Prommis was the owner of most of the non-legal assets of the predecessor firm of J&F, and most of the non-lawyer employees of the predecessor firm were employees of Prommis by virtue of prior transactions. *See id.* J&F and Prommis had a number of agreements, including Prommis's commitment to provide bankruptcy and foreclosure support services to J&F. *Id.*

As explained by the court, Prommis's support services were "innovative" and "identical" to the types of services that would be provided by in-house paralegals and support staff. *Id.* at 501. J&F paid Prommis for services on a monthly basis based on bulk, flat-fee based billing. *See id.* at 503. J&F paid Prommis no matter what the client might be awarded as reimbursement of fees by the court, and the client likewise paid J&F even if it might be awarded less by the court. *See id.* J&F also prepared the templates used by Prommis in the course of providing support services (including Prommis's preparation of an agreed order used in the bankruptcy proceedings based on a J&F template). *See id.*

The court had no trouble concluding that the $600 fee was reasonable despite approximately 85% of it being used to pay a non-lawyer vendor. *See id.* at 505. The arrangement was not illegal fee-sharing, and, in fact, was no different than a law firm paying

outside vendors or its own employees and paralegals. *See id.* at 506. The court complimented the role of Prommis: "The use of paralegal employees, whether outsourced or 'in house,' reduces the time that must be devoted by a licensed attorney, and, in turn, reduces the costs to all parties." *Id.* at 507. Finally, while reiterating that the facts did not establish improper fee sharing or the unauthorized practice of law, the court noted that Mississippi does not permit a private cause of action based on a violation of its Rules of Professional Conduct. *See id.* at 509.

As with J&F in *Thorne*, Mr. Sherrow outsourced components of his work, and he did so in a manner that actually resulted in lower fees than would have been incurred had he undertaken to perform every item of work himself. *Supra* § III.C. As in *Thorne*, Mr. Sherrow's payments for vendor expense were a large percentage of overall revenues, but there is nothing unlawful about that fact. As in *Thorne*, the clients here (TELS and TELI) paid Mr. Sherrow each month regardless of whether anything might be recovered from the delinquent taxpayers, Mr. Sherrow similarly paid LDS each month with no contingency, and LDS used templates either created by, or at least approved by, Mr. Sherrow. *Supra* § III.C. And, as in *Thorne*, even if Plaintiffs could claim that the payment of vendor fees constituted fee-sharing or aiding the unauthorized practice of law, Kentucky does not permit a private cause of action based on alleged ethics violations by an attorney. *See Rose v. Winters*, 391 S.W.3d 871, 873–74 (Ky. Ct. App. 2012); *Winchester v. Educ. Mgmt. Corp.*, No. 5:10-CV-00012-TBR, 2010 U.S. Dist. LEXIS 60660, at *3 (W.D. Ky. June 18, 2010).[18]

---

[18] "The sole remedial method for a violation of the Code is the imposition of disciplinary measures after a hearing by the Board of Governors of the State Bar Association . . . . The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability." *Rose*, 391 S.W.3d at 874 (citations omitted).

**E. TELS and TELI are Entitled to Recover "Attorney's Fees" Even if Mr. Sherrow or Other Attorneys Outsource Components of Their Work to Entities Associated with TELS and TELI.**

It is proper for Mr. Sherrow to charge attorney's fees for work that he (or other attorneys) personally performed. It is permissible for him to charge attorney's fees for work performed by non-lawyers in his office. It is permissible for him to outsource work to non-lawyers and include such expenses as part of his attorney's fees. What, then, gives rise to a RICO enterprise or any other wrongdoing here? Plaintiffs' last-ditch effort to answer that question is to take issue with the fact that LDS and BGA are associated with TELS and TELI. There is no authority for that assertion, and cases addressing similar claims have rejected such a theory outright. *E.g.*, *Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 661–62 (8th Cir. 2012); *Giotta v. Ocwen Fin. Corp.*, No. 15-cv-620-BLF, 2015 U.S. Dist. LEXIS 167108, at *25–27, 30–31, 34–35 (N.D. Cal. Dec. 11, 2015).

There is a reason why Plaintiffs constantly mischaracterize the facts by claiming that Mr. Sherrow sends fees "back to Tax Ease." Plaintiffs want the Court to believe that the fees are not real because Mr. Sherrow just gives money back to his clients. Even if true (and it is not), this might only be an ethics violation and could not give rise to a private cause of action. *See Rose*, 391 S.W.3d at 874. But, none of Mr. Sherrow's fees "go back" to anyone. LDS and BGA are not Mr. Sherrow's clients. TELS and TELI are. LDS and BGA are vendors who performed services for Mr. Sherrow and other attorneys representing TELS and TELI, and, as established above, vendor fees are properly included within the scope of "attorney's fees."

There is nothing illegal or improper about the fact that the Tax Ease Defendants have common ownership, or that Tax Ease Employee Services Company provides staffing for each of them (as well as a number of other Tax Ease companies). TELS, TELI, LDS, and BGA are distinct companies with distinct operations. There is nothing unlawful about companies having

common ownership. *See, e.g.*, *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 404 (S.D.N.Y. 2007) (finding allegations of common ownership, common principals, and common addresses insufficient to allege the existence of an alter-ego). LDS and BGA provide services to attorneys who have represented TELS and TELI, but there is nothing unlawful about an attorney's use of vendors, whether they are affiliated with the client, the attorney, or anyone else. *See, e.g.*, *Bobrow*, *supra*, 549 F. Supp. 2d at 285–86 (listing vendor fees as a recoverable component of attorney's fees). TELS, TELI, LDS, and BGA share office space, and all employees are formally employed by Tax Ease Employee Services Company, but there is nothing wrongful about such arrangements either. *See, e.g.*, *Waite v. Schoenbach*, 10 civ. 3439, 2010 U.S. Dist. LEXIS 115470, at *10 (S.D.N.Y. Oct. 29, 2010) (finding allegation that parties "operate at the same location and share employees, officers, owners, and bank accounts" insufficient to support a claim of veil piercing). Plaintiffs have never identified anything wrong with affiliated companies using the services of the same employees. The practice is so common that the Department of Labor has established regulations concerning shared employees, *see* 29 C.F.R. 791.2(a), and its website provides a handy visual aid to illustrate the concept:



*Available at*: http://www.dol.gov/whd/flsa/Horizontal_Joint_Employment.pdf (last visited March

28, 2017).

Courts addressing arguments similar to those made by Plaintiffs have held that fees attributable to affiliated vendors are permissible. For example, in *Gomez*, *supra*, the plaintiffs alleged under RICO and other theories that the defendants improperly inflated appraisal fees by using an affiliate to obtain deep discounts from appraisers, but then charging market rates to the plaintiffs. The court held that there could be no RICO claim under those facts because the plaintiffs paid market rates. *See* 676 F.3d at 661–62. There was no basis to claim that the defendants were required to pass any discounts obtained by the affiliate along to the plaintiffs. *See id.* Additionally, the plaintiffs artificially focused only on the "field work" component of appraisal process and disregarded other work that went into the final appraisal. *See id.*

Here, Plaintiffs paid pre-litigation charges at rates substantially below the amount deemed presumptively reasonable by KRS 134.452 and well below what other third party purchasers charge for similar services, with the approval of courts evaluating those fees. *Supra* § IV.B.1. The fees that Mr. Sherrow was able to charge by using LDS were even lower than the fees charged to TELI by Ms. Lawson when she provided pre-litigation services without the use of LDS. *Supra* § III.B. Further, just as the *Gomez* plaintiffs artificially focused on the field work component of the appraisal process, Plaintiffs arbitrarily focus solely on the costs for BGA's abstractors to obtain the raw data. Plaintiffs ignore the analysis and additional work performed by BGA in addition to the field work. *Supra* § III.D. As in *Gomez*, Plaintiffs offer no support for any of their claims.

*Giotta*, discussed above, also presents helpful analysis. The plaintiffs contended that the defendants conspired "to defraud homeowners in default on their mortgage loans by charging them excessive and duplicative fees relating to the servicing of those loans." 2015 U.S. Dist.

LEXIS at *3.  The defendant mortgage servicing business utilized related entities to provide certain services to defaulting homeowners.  *Id.* at *4.  The plaintiffs alleged that by hiring the related entities to provide services that had once been provided in-house, the defendant mortgage servicer "was able to charge borrowers artificially and unfairly high prices" and charge for duplicative services.  *Id.*  The plaintiffs took particular issue with the defendants' failure to disclose the use of affiliated entities.  *Id.* at *23–24.

The court granted the defendants' motion to dismiss the RICO and other claims.  First, the court held that there was no duty to disclose any affiliations.  *Id.* at *25.  Second, the court held that there were no circumstances alleged to demonstrate that the defendants' fees were unlawful or unfair.  As conceded by the plaintiffs, nothing barred the defendant from "add[ing] a charge for itself when passing through costs of services performed by an unrelated third party." *Id.* at *26.  The plaintiffs cited, and the court could find, no case or authority changing the analysis simply because the defendant used an affiliated vendor.  *Id.* at *27.  The court also rejected the plaintiffs' challenge to a "belt-and-suspenders" approach that allegedly resulted in additional, unnecessary fees, as there was neither a factual nor a legal basis to conclude that such an approach was unlawful or unfair.  *See id.* at *30–31, 34–35.

Here, as in *Giotta*, Plaintiffs' entire case boils down to their assertion that Defendants committed RICO violations, fraud, and a host of other alleged wrongs simply because attorneys hired by TELS and TELI hired vendors affiliated by ultimate ownership with TELS and TELI in performing legal work.  As concluded in *Giotta*, there is no authority for such a proposition. Plaintiffs cannot claim that the fees would be improper if Mr. Sherrow, Mr. Craig, and other attorneys had personally performed every task themselves.  *Supra* § IV.B.  They cannot claim that the fees would be improper if some of the work had been performed by the attorneys' in

house paralegals and staff. *Supra* § IV.C. They cannot claim that there would be anything wrong with outsourcing work to unaffiliated vendors. *Supra* § IV.D. They cannot, then, claim that the fees are improper solely because LDS and BGA are affiliated with TELS and TELI. As in *Giotta*, there also is no basis to claim that BGA's fees are unreasonable simply because BGA puts more into its title reports than merely forwarding the attorney a stack of property records. There is nothing unlawful or unfair about BGA taking additional steps to provide a complete, user-friendly title report and analysis (and additional information, such as service of process information) to foreclosure counsel—especially in light of the fact that, if it did not do so, the attorney or his staff would have to perform (and charge for) that additional work themselves.

Presumably, Plaintiffs' final effort to claim wrongdoing would be to argue that TELS and TELI should have disclosed to delinquent taxpayers that some of the fees and charges were attributable to work performed by entities affiliated with TELS and TELI. A RICO claim cannot be premised on a fraudulent failure to disclose unless there is an independent duty to disclose, such as a fiduciary or statutory duty. *Eller v. EquiTrust Life Ins. Co.*, 778 F.3d 1089, 1092 (9th Cir. 2015). Kentucky law (which applies to all of the non-RICO claims) is similar, permitting claims grounded in omissions only when a fiduciary or statutory duty exists, when there is a partial disclosure falsely portrayed as a full disclosure, or when one party to a contract has superior knowledge of material matters and is relied upon to disclose that knowledge (e.g., when a seller knows that goods are defective in some way, but the buyer has no way of knowing this fact). *See Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 747 (Ky. 2011). Plaintiffs have not alleged a fraud-by-omission claim, and even if they did, the facts cannot show the existence of any conceivable duty to disclose any affiliations. KRS 134.490 spells out what information must be provided to delinquent taxpayers in any required notices, and it contains no

requirement to disclose any affiliations. An attorney seeking a fee is not required to detail how every dollar of his fee ultimately is used, but only to describe the work performed and the rate charged for that work.

*Giotta*, as discussed above, rejected any disclosure based theory in a context similar to this one, and it is not alone in doing so. In *Bigsby v. Barclays Capital Real Estate, Inc.*, 170 F. Supp. 3d 568 (S.D.N.Y. 2016), the plaintiffs alleged RICO claims based, in pertinent part, on an alleged fee-shifting scheme in which Barclays charged for administrative and outsourcing fees supposedly concealed as "attorney's fees." *See id.* at 572. The claims arose from Barclays' use of Fidelity as an intermediary between Barclays and the various firms performing legal services for it. *See id.* at 573–74. The plaintiffs claimed that the true nature of the "attorney's fees" incurred (which incurred charges relating to this arrangement) was unlawfully concealed and violated ethical prohibitions on fee sharing. *See id.* at 574, 576. The court held that, at best, the allegations could constitute a breach of contract if the defendants charged fees that were not actually permitted by the loan agreements and held that, in any case, alleged ethics violations cannot form the basis of a cause of action. *See id.* at 576–77. The court also held that there was no allegation that Barclays knew that any of the fees were somehow impermissible when they were billed, defeating any finding of scienter. *See id.* at 578–79. Thus, the court dismissed the RICO claim. *See id.* at 576–79. This Court should reach the same conclusion here. The fees at issue are expressly allowed by KRS 134.452, and there is nothing wrongful about them (nor is there any evidence that Defendants somehow knew that any fees were wrongful).

Similarly, in *Vega v. Ocwen Fin. Corp.*, No. 2:14-cv-4408-ODW(PLAx), 2015 U.S. Dist. LEXIS 37079 (C.D. Cal. Mar. 24, 2015), the court addressed the question of whether the defendants' failure to disclose led to liability in a proposed class action for RICO, fraud, and

other claims.  The defendants in *Vega* operated a residential mortgage servicing business and serviced the plaintiff's defaulted mortgage for almost a year.  *Id.* at *2.  The plaintiff alleged that the defendants assessed excess fees for unnecessary property inspections and subjected her to an invalid debt.  *Id.* at *3.  She also contended that the defendants wrongfully failed to "disclose the nature of the charges and fees assessed."  *Id.*

The *Vega* court found the plaintiff's allegations that the defendants wrongfully failed to disclose the nature of the fees to be illogical.  The court explained that the plaintiff essentially sought to hold the defendants liable because they "did not label each itemized property inspection as 'unnecessary' on [the plaintiff's] monthly billing statement."  *Id.* at *17.  The plaintiff apparently believed that the defendants' "failure to admit breach of contract liability in her monthly statements subject[ed them] to further liability."  *Id.*  The court went on to distinguish cases cited by the plaintiff because those cases involved material misrepresentations where the mortgage servicer disguised the property inspections by labeling them something other than property inspections.  *Id.* at *18–19.  Ultimately, the court concluded that the defendants' failure to place the term "unnecessary" on the billing statements in no way rose to the level of fraud or deception and did not establish liability under the RICO statute, fraud, or any other theory.  *Id.* at *19, 40–41.

The situation here is analogous to that in *Vega*.  Plaintiffs claim that there are fictitious fees and charges being collected, but every fee and charge was expressly disclosed.  Just as the failure to label fees as "unnecessary" could not give rise to a cause of action in *Vega*, the failure to label the fees at issue here as anything other than what they were—fees charged by Mr. Sherrow or title fees charged by BGA—cannot form the basis of any claim as a matter of law.

## V.  CONCLUSION

The Kentucky General Assembly created the third party purchaser system to combat the

serious harms caused by tax delinquency. The General Assembly has taken great care to define the types of recoverable fees and the amounts deemed reasonable for those fees and charges. The fact regarding the fees charged, the entities at issue, and other material matters are undisputed. TELS and TELI have charged only the types of fees that they are entitled to charge, and all amounts charged to Plaintiffs are well within the amounts deemed reasonable by KRS 134.452. Those fees were generated from work performed by licensed Kentucky attorneys and vendors performing services on their behalf that went into the overall representation of TELS and TELI. All such work, by attorneys and vendors alike, is compensable as part of the attorney's fees recoverable by statute. The mere fact that two vendors had an affiliation with TELS and TELI does not change the analysis. This fact does not convert permissible business relationships and attorney-client relationships into a RICO enterprise, a fraudulent scheme, or anything else improper. Because all of Plaintiffs' claims rest on fundamentally flawed understandings of what constitutes an attorney's fee, the Court should enter summary judgment in favor of the Tax Ease Defendants on all remaining counts of the complaint.

Respectfully submitted,

*/s/ Chadwick A. McTighe*
Joseph L. Hamilton (jhamilton@stites.com)
Marjorie A. Farris (mfarris@stites.com)
Chadwick A. McTighe (cmctighe@stites.com)
STITES & HARBISON, PLLC
400 West Market Street
Suite 1800
Louisville, KY 40202-3352
Telephone: (502) 587-3400

*Counsel for Tax Ease Lien Servicing, LLC, Tax Ease Lien Investments 1, LLC, Blue Grass Abstract, LLC, Lien Data Services, LLC, and Philip S. Migicovsky*

1133797:6:LOUISVILLE