UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE


JAMES BROWN, et al.                                                          PLAINTIFFS


v.                                                   CIVIL ACTION NO. 3:15CV-208-CRS


TAX EASE LIEN SERVICING LLC, et al.                                        DEFENDANTS



## MEMORANDUM OPINION


        The plaintiffs urge in this case that the defendant corporations and attorneys are profiting from the debts of Kentucky citizens under the state-created system for the third-party purchase of certificates of tax delinquency (also referred to herein as "tax liens").    This is true.  The plaintiffs also contend that the defendants, third party purchasers of delinquent tax certificates, set up a system for collection whereby prelitigation attorneys' fees were generated in the early stages of the collection process and these fees were added to the delinquent tax bills, significantly increasing the amount of the debt.  This is true.  Further, the plaintiffs contend that the system allowed entities affiliated with the third-party purchasers to also make a great deal of money in the collection process.  This is also true.

        The defendants are unapologetic for finding innovative ways to maximize profits for their respective companies, purportedly within the bounds of the statutory scheme.   Whether the business practices of these affiliated companies fall within the bounds of the law is the very question at issue.  The issue presently before the court on summary judgment is truly the pivot point in the case.

The plaintiffs' case rests upon the single premise that the fees charged by the defendants and added to the tax bills of the plaintiffs are not actual reasonable attorneys' fees. The defendants contend that the fees are not, in fact, attorneys' fees at all, but rather are padded charges disguised as attorneys' fees designed to increase profits to the defendants on collection of the bills. They also contend that the fees are not reasonable because work was not done to earn the fees charged. The defendants, of course, dispute these allegations and have moved for summary judgment on this issue, noting that if, as a matter of law, the fees charged are actual reasonable attorneys' fees, all of the plaintiffs' claims must fail, as they are premised on misrepresentation and fraud, statutory violations, or wrongfully obtained benefits.

The defendants in this case are:

Tax Ease Lien Servicing, LLC ("TELS"); Tax Ease Lien Investments 1, LLC ("TELI"), and Blueshine, LLC (collectively, "third-party purchasers");

Blue Grass Abstract, LLC ("BGA"); and Lien Data Services, LLC ("LDS") (collectively, "vendors");

Philip S. Migicovsky, a former manager of TELS, TELI, BGA and LDS; Trey Gulledge, a manager, Chief Investment Officer, and former Chief Operating Officer of TELS, TELI, BGA and LDS;

Tax Ease Holdings, LLC f/k/a Tax Ease L.P. ("TEH"); and Tax Ease Funding Two, LLC ("TEF"); and

Richard Eric Craig, Billy W. Sherrow, and Sherrow, Sutherland & Associates, PSC (collectively, "attorneys").

The plaintiffs urge that the defendants have manipulated the prelitigation attorneys' fees provision of KRS 134.452 to their own purposes in a way that further compounds the debt already overburdening the delinquent property owner. Painting a picture of corporate greed and

dishonesty, the plaintiffs chastise the defendants for seeking to increase the already healthy profits made by third-party purchasers. However, the system put in place by the Kentucky legislature is clearly designed to incentivize third-party purchasing by permitting companies who do so to earn profits. *Bluegrass Tax Lien Bureau, LLV v.* Grise, No. 2015-CA-001889-MR, 2016 WL 7324253, *4 (Ky.App. Dec. 16, 2016)("a third-party purchaser of the delinquent tax certificate was entitled to collect attorney's fees, interest, administrative fees, and costs. KRS 134.546(2), 134.452. These additional monies provide an incentive for third-party purchasers that our legislature has deemed necessary."). Tax collection, whether by the government or private entities, is, to say the least, unpopular. However, as expressed by Representative Arnold Simpson[1] in the Senate Appropriations and Revenue Committee's discussion of HB 545 (28:01-28:20),

https://www.ket.org/legislature/?archive&program=WGAOS&epoch=2012&nola=WGAOS+013252, which brought forth the 2012 amendments to KRS Chapter 134, "We might not like third-party purchasers; we might not like tax collectors; but they are a necessary evil."

The plaintiffs in this case, James Brown; Denise Puckett, Executrix; Phillip Leigh; Third Century Development Corporation; and Laura Branson,[2] generally allege the following:

> This is a class action brought on behalf of Mr. Brown; Ms. Puckett, executrix; Mr. Leigh; Third Century; Ms. Branson and a class of all owners, lenders, and purchasers of Kentucky property who have had fraudulent, unlawful, non-actual, and unreasonable attorney's fees and costs sought or extracted from them in connection with the collection of tax certificates of delinquency by the defendants and their association-in-fact. The defendants, individually and through their association-in-fact, operate a state-wide fraudulent scheme to collect excessive

---

[1] Not related to the undersigned.

[2] There were three prior iterations of the complaint filed in state court in 2015 prior to removal. The current iteration styled "First Amended Class Action Complaint" was permitted to be filed in this court on May 25, 2017. A number of former plaintiffs still appear in the facts section of the complaint, and a number of claims which have been dismissed as between various plaintiffs and defendants still appear in the various counts. We need not parse these inaccuracies for purposes of this opinion. We merely note that the above-listed plaintiffs are the ONLY plaintiffs set forth as proposed class representatives of the putative class. Therefore, the claims must be viewed through the lens of their claims only.

and unlawful costs many times more than the legal total return on tax certificates of delinquency.

First Amended Class Action Complaint ("FACAC"), DN 154, PageID #3907.

The five named plaintiffs in this action failed to pay their property taxes for various reasons immaterial to this opinion. Certificates of tax delinquency are issued in Kentucky when real property owners fail to pay their property taxes. These certificates of delinquency constitute a lien on the property to secure the unpaid taxes, interest and penalties. KRS 134.122(2); 134.125(1), 134.420. Many states, including Kentucky have enacted systems enabling third parties to purchase and collect on these certificates. In Kentucky, third-party purchasers pay the full amount of the tax bill including any interest and penalties. They are then entitled to collect (1) the amount actually paid for the certificate, (2) interest, (3) the actual reasonable prelitigation attorneys' fees incurred, up to a capped amount, for their collection efforts, (4) actual reasonable attorney's fees that arise due to litigation, and (5) certain administrative fees.

Initially, the right to collect attorneys' fees in enforcing certificates of delinquency was recognized in *Flag Drilling Co. Inc. v. Erco, Inc.*, 156 S.W.3d 762, 766-67 (Ky.App. 2005), but there were no statutory constraints placed on third party purchasers attempting to collect on these certificates. In 2007, in order to curtail gouging practices, the legislature enacted KRS 134.452 setting out what a third-party purchaser could collect, and imposing caps on various fees and costs which could be collected in addition to the amount paid for the certificate and interest.

This 2007 version of the statute is the operative one with respect to the plaintiffs' claims. It provided, in pertinent part, that "a third-party purchaser…shall be entitled to collect…attorneys' fees incurred for collection efforts prior to litigation." KRS 134.452 (2007). The statute limited the recovery of actual and reasonable attorneys' fees incurred to a percentage of the amount paid for the certificate: For a tax bill of $5 to $350, 100% of the amount of the

certificate, not to exceed $350, could be collected.  For a tax bill of $351 to $700, 80% of the

amount of the certificate, not to exceed $560, could be collected. For a tax bill of $701 or greater,

70% of the amount of the certificate, not to exceed $700, could be collected.  For groups of tax

bills against one taxpayer, 1.5 times the maximum amount permitted to be collected for the

largest tax bill of the group could be collected.

The statute was amended in 2012 to more particularly identify the fees that can be

collected by third-party purchasers.  This version of the statute is not determinative of the claims

herein, as it applies to certificates of delinquency purchased on or after April 23, 2012, and the

plaintiffs' tax bills were purchased before that date.  However, we find it persuasive in our

analysis because this version identifies what the legislature has acknowledged is embodied in

prelitigation attorneys' fees incurred for collection efforts, and what constitutes reasonable fees

for such work.  The statute concludes, rather unusually, that

> The General Assembly recognizes that third-party purchasers play an important
> role in the delinquent tax collection system, allowing taxing districts to receive
> needed funds on a timely basis.  The General Assembly has carefully considered
> the fees and charges authorized by this section, and has determined that the
> amounts established are reasonable based upon the costs of collection and fees
> and charges incurred in litigation.

KRS 134.452(5).  The 2012 statute did not plow new ground.  Rather, it refined the category of

"attorneys' fees incurred for collection efforts prior to litigation," the 2007 provision, to specify

what work falls within the statute's parameters.  The 2012 provision states that a third-party

purchaser is entitled to collect

> Prelitigation attorneys' fees, which may include amounts incurred for collection
> efforts and costs related to notification, processing, research, communication,
> compliance, legal costs, documentation, and similar expenses, from the date the
> third-party purchases the certificate of delinquency from the county clerk, to the
> date on which the notice required by KRS 134.490(2) is mailed by the third-party
> purchaser.

KRS 134.452(1)(c).

The caps on actual reasonable fees remain the same, based upon the amount paid by the third party for a certificate of delinquency. 134.452(2). In addition to the cap on the total prelitigation attorneys' fees which may be collected in a given case, the statute also imposes a cap of $175 per notice sent to the delinquent taxpayer, and limits the accrual of fees to a taxpayer's account to a maximum of $175 per ninety-day period no matter how many notices are sent.134.452(3).

The plaintiffs in this case allege a coordinated scheme by the defendant third-party purchasers, vendors, and attorneys to defraud delinquent taxpayers by adding fees to their settlement charges as prelitigation attorneys' fees which were not, in fact, actual reasonable attorneys' fees, as required by statute, and thus were not collectible from the taxpayer. After careful scrutiny of the evidence and arguments, we find that there is no genuine issue of material fact concerning the actions of the defendants in this case and that the defendants are entitled to summary judgment, as the plaintiffs have failed to come forward with evidence to controvert the bases for finding that the prelitigation attorneys' fees charged were both actual and reasonable.

Before granting a motion for summary judgment, the Court must find that "there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]here the moving party has the burden—the plaintiff on a claim for relief or defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (internal quotations and emphasis omitted).

The Court must view the evidence in a light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must show that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence ... of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

When both parties move for summary judgment, this Court "must evaluate each motion on its merits and view all facts and inference in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

I.

We begin with a number of unassailable principles which form the foundation for our judgment in favor of the defendants in this case. First, there is nothing in KRS 134.452 which prevents a third-party purchaser from engaging an attorney to perform prelitigation collection efforts. Attorneys' fees for such efforts and attendant costs may relate to notification, processing, research, communication, compliance, legal costs, documentation, and similar expenses. The plaintiffs do not argue that any of these categories fall outside the boundaries of prelitigation collection efforts by attorneys. We reiterate that the 2012 version of KRS 134.452 where this itemization appears does not control in this case, but does evidence the legislature's

understanding of the prelitigation collection process and codifies what is anticipated to occur in actual practice.

KRS 134.452 establishes a statutory maximum dollar amount, based upon the amount paid for the certificate of delinquency, which may be collected by a third-party purchaser for actual reasonable prelitigation attorneys' fees incurred in collection efforts. The maximum amount may be collected with impunity as long as the amount sought is for actual reasonable attorneys' fees incurred. Any motivation underlying a third-party purchaser's business model, greed for example, is immaterial. The fact that a business model allow a third-party purchaser to incur the maximum amount in prelitigation attorneys' fees is also immaterial, as actual reasonable attorneys' fees up to the maximum amount are absolutely recoverable. By the same token, "KRS 134.452 authorizes, but does not mandate the award of attorneys' fees." *Tax Ease Lien Servicing, LLC v. Smith*, No. 2013-CA-002095-MR, 2014 WL 7013251, *4 (Ky.App. Dec. 12, 2014). The statute "repeatedly employs permissive language, such as 'may be collected,' and it expressly requires such fees to be actual and reasonable…[T]he statute as written does not automatically bestow upon a third-party purchaser whatever fees and costs it claims…[A] determination of the reasonableness of attorneys' fees 'should be done with a view to common sense realism[.]' *In re Citizens Fidelity Bank & Trust Co.*, 350 S.W.2d 569, 570 (Ky.App. 1977)." *Id.* Further, KRS 134.452 does not require a third-party purchaser to *justify* its expenses, but the statute expressly limits those fees to those which are actual and reasonable, and the third-party purchaser must prove as much. *Id.* at 5.

The purchaser of the certificate need not seek to benefit the delinquent taxpayer by its actions. The third-party tax lien purchase system is designed to profit the third-party purchaser in order to promote purchases, and to facilitate the collection of delinquent taxes. The statute

permits the third-party purchaser the discretion to structure its prelitigation collection efforts as it sees fit. The purchaser could proceed without an attorney and attempt to collect on the certificate, and it also permits the purchaser to utilize the services of an attorney in those efforts, at extra cost, but within defined limits. As both options are equally available to the third-party purchaser, it cannot be faulted for choosing the more expensive alternative. Nor can the third-party purchaser be faulted for adding actual reasonable attorneys' fees which will ultimately be borne by the taxpayer, since it is the statute, not the purchaser, that has so structured the process.

Next, as noted by the United States Supreme Court, "a 'reasonable attorney's fee' cannot have been meant to compensate only work performed personally by members of the bar. Rather, the term must refer to a reasonable fee for the work product of an attorney. Thus the fee must take into account the work not only of attorneys, but also of secretaries, messengers, librarians, janitors, and others whose labor contributes to the work product for which an attorney bills her client; and it must also take account of other expenses and profit." *Missouri v. Jenkins*, 491 U.S. 274, 285, 109 S.Ct. 2463, 2470 (1989). The plaintiffs do not dispute this holding. As recognized by the American Bar Association in Formal Opinion 08-451 (Aug. 5, 2008), "A lawyer may outsource legal or nonlegal support services provided the lawyer remains ultimately responsible for rendering competent legal services to the client under Model Rule 1.1" Of note, in the commentary to the Opinion, is the following passage:

> There is no unique blueprint for the provision of competent legal services. Different lawyers may perform the same tasks through different means, all with the necessary "legal knowledge, skill, thoroughness and preparation." One lawyer may choose to do all of the work herself. Another may delegate tasks to a team of subordinate lawyers and nonlegal staff. Others may decide to outsource tasks to independent service providers that are not within their direct control. Rule 1.1 does not require that tasks be accomplished in any special way. The rule requires only that the lawyer who is responsible to the client satisfies her obligation to render legal services competently.

*Id.*, p. 2. Thus it is neither unusual nor impermissible for attorneys to outsource work to legal and nonlegal staff so long as the attorney remains ultimately responsible for rendering competent legal services to the client. The plaintiffs do not criticize the attorneys' engagement of vendors LDS and BGA in this case solely because of the attorney-vendor relationship. Rather, the plaintiffs' criticism is that LDS and BGA are owned by the same holding company, TEH. Thus, the plaintiffs argue that when the attorney pays the vendors' fees, it is "paying it back" to TEH. This leads us to the next unassailable principle.

There is nothing illegal or improper about the fact that the third-party purchasers, TELS and TELI,[3] and the vendors, LDS and BGA, are owned by holding company TEH. The plaintiffs do not dispute that they are separate legal entities. The defendants also do not dispute that TELS, TELI, LDS, BGA, TEF, and TEH share office space, and that all of the employees are formally employed by Tax Ease Employee Services Company, and acknowledge that this is neither uncommon nor improper. Specifically, the plaintiffs state:

> While Tax Ease goes to great lengths to point out that there is nothing fundamentally illegal about its business structure, the plaintiffs have never suggested otherwise. Tax Ease's heavily leveraged, multi-state operations are well suited for multiple interrelated subsidiaries. The issue is not *how* Tax Ease is structured, but rather what it does with that structure.

Pl. Resp., DN 173, p. 29.

The parties discuss *Giotta v. Ocwen Financial Corporation*, No. 15-cv-00620-BLF, 2015 WL 8527520 (N.D.Cal. Dec. 11, 2015) which explored whether Ocwen's practice of adding a charge for itself when passing through costs of services, a legitimate practice when using an unrelated third party, became unlawful or unfair when it used a spin-off company. The court found no authority to support the position that use of an affiliated company rendered the practice

---

[3] Blueshine is also a third-party purchaser owned by TEH, but none of the transactions discussed with respect to the purported fraudulent schemes involved Blueshine.

illegal or unfair.  The court cited *Walker v. Countryside Home Loans, Inc.*, 98 Cal.App.4[th] 1158,

1177 (2002) in which the court found that charging a borrower fees for property inspections

performed by a company  affiliated with the lender was not unfair.  The *Walker* court considered

that there was no showing of a disregard for the separate corporate entities nor were there fees

charged for inspections not performed.  *Id.* at *7.  The court concluded that "[u]sing an affiliated

company conceivably could reduce transaction costs and increase efficiency, to the consumer's

benefit." *Id.*

The plaintiffs distinguish their claims from those in *Giotta*.  In *Giotta*, the plaintiffs'

claims failed because they were unable to identify what regulation or law made the alleged up-

charge therein unlawful or unfair, or what standard was to be used to distinguish between

reasonable profit and an unlawful level of profit.  *Giotta*, 2015 WL 8527520 at *7.  The plaintiffs

here state that

> In this case, the standard is provided by KRS 134.452, which requires that any
> claims for pre-litigation attorneys' fees and litigation costs be both "actual" and
> "reasonable."  There are well-established standards for determining what a
> reasonable attorney's fee is.  In this case, Tax Ease wants the Court to believe
> that when 90% or even *100%* of a charge is paid to an affiliate that it magically
> becomes an actual and reasonable attorney's fee because it was billed through
> Tax Ease's law firm.  That aspect of the case is completely absent from *Giotta*,
> and the conclusions in that case do not exonerate Tax Ease's conduct in this
> action."

Pl. Resp., DN 173, p. 30 (emphasis in original).  What is clear that the plaintiffs do not dispute

the legitimacy of Tax Ease's corporate business structure and operations.  There is no contention

that the defendants exhibited disregard for the separate corporate entities. Further, the plaintiffs

have not challenged the cited authority that the sharing of workspace, managerial structure, and

employees does not operate to impair the companies' properly recognized individual corporate

existence.

The plaintiffs argue that it was a fraudulent manipulation of the "prelitigation attorneys' fees" provision in KRS 134.452 for TELS and TELI's to engage an attorney, who engaged vendor LDS and/or BGA to perform services, and then included the vendors' fees and costs in billing for the attorney's work product. The plaintiffs contend that the defendants cannot add these fees and costs to the tax bills, inasmuch as they were intended to artificially maximize profit to the defendants and were therefore not actual reasonable attorney's fees. In a nutshell, as the plaintiffs concisely stated in their response, "Tax Ease engaged Kentucky attorneys…to help create the paper trail making these transactions look real." *Id.* at p. 5.


II.

Kentucky property taxes bills that become delinquent and remain unpaid are transferred to the County Clerk for the county where the property is located and the Clerk then issues a certificate of delinquency. This certificate serves as a lien against the property at issue. KRS 134.420(1). These certificates may be sold to a qualifying third party. KRS 134.128(1). A third-party purchaser of more than five certificates of delinquency in the Commonwealth, or more than three certificates in any one county in Kentucky, must first apply and be approved to purchase the certificates. If approved, the third-party purchaser must register with the Kentucky Department of Revenue annually. KRS 134.129.

When certificates are purchased, a third-party purchaser is required to send written notice of the purchase to the delinquent taxpayer within fifty days of the delivery of the certificate to the third-party purchaser, and at least annually thereafter. KRS 134.490(1)(referred to as a "fifty-day letter"). "Third-party purchasers can collect on these tax certificates by negotiating with the delinquent taxpayer, or by filing a lawsuit to enforce the lien. KRS 134.546(2). However, they

must wait one year after the taxes become delinquent before filing suit." *Farmers National Bank v. Commonwealth*, 486 S.W.3d 872, 876 (Ky.App. 2015). Written notice must also be sent to the taxpayer at least forty-five days prior to the commencement of foreclosure proceedings. KRS 134.490(2)(referred to as a "forty-five day letter"). Attorneys are often engaged by third-party purchasers to ensure compliance with the detailed statutory requirements.

In their summary judgment motion, the defendants provide an overview of the prelitigation collection efforts engaged in by the affiliated Tax Ease entities.

According to the testimony of William C. "Billy" Abshier, Gulledge's assistant and the individual in charge of third-party purchasing in Kentucky, prior to 2007, when the Tax Ease entities TELS and TELI were formed to make third-party purchases of tax delinquency certificates in Kentucky, and started reaching out to property owners, they did not have a great deal of success. At that time, TELS and TELI's involvement was relatively passive. After the purchase, the certificates were stored, and the tax lien information would be input into their system. A spreadsheet would be generated containing an internal stock number, the amount owed, the tax bill information, property information, and the owner's mailing address. The lien would be filed and TELI/TELS would send the information to Kentucky attorney Virginia Lawson who was retained to advise them on the collection process and to send the fifty-day letter to the delinquent taxpayer. TELS/TELI would then do nothing more than take phone calls, redemptions, or process any legal paperwork. Lawson charged $75 per letter.[4] She performed a mail merge of the letter and list herself and mailed the letters out.

In an effort encourage redemptions, Lawson was requested to send a number of test batches of additional notification letters to see whether further communication would encourage

---

[4] There is at least one person who recalls Lawson charging $125 per letter. The accuracy of this detail is not critical to the decision.

movement on these tax bills. Abshier stated, "sure enough, as you would expect, if you get an additional notice letter, you're more likely to pay it off than your peers that had received no letter in that time frame." W. Abshier depo., p. 26. It was also discovered that poor recordkeeping systems in many of the county PVA offices resulted in letters not reaching current owners at current addresses. Lawson did not attempt to update the PVA information herself. Lawson depo., p. 23. PVA cards were apparently not required at that time. *Id.*, p. 24.

Abshier testified that he believes the initial concept of providing value to the attorney and changing to a more active approach to prelitigation collection was his. With regard to the concept, Abshier testified:

> We know we want to send letters to try to increase redemptions. We know…we have the opportunity to do it…So we knew we needed to go back and update these mailing addresses for everyone. And we thought that we could sell to the attorney. Say, hey, look, we're going to ask you to send letters, we're going to ask you to send them to these updated mailing addresses, and we think we've got the vendor management system to handle getting those updates for you. And that was the business plan…[U]p to this point, we had not done any of that and we were still collecting. We just wanted to collect faster. So we didn't have to do any of this additional work. We had legally fulfilled our obligation, but we could sit on our hands and do nothing, or we could try to reach out and actually notify the property owner, the current property owner of their tax obligation…If they wanted to pay off their first letter they received, they were going to be paying less…I think the final amount we agreed on was $62.50, which was something like a 10 or 15 percent reduction, then they were going to be saving money initially off that letter. If they didn't, then they were going to be getting additional letters…at a lower rate. But we were going to start sending more frequent letters, if they took, say, a full two years to pay and received, say, eight letters during that time frame to the full maximum prelitigation fee amount, they were going to be paying more because of their inaction. But the trade-off for that was that they…were going to be consistently trying to find…the true property owner that owed us the money and letting them know they owed us the money rather than just sitting there until it was time to foreclose.

W. Abshier depo., pp. 27-31.

There is no question that the strategy was intended to (1) more actively pursue prelitigation collection efforts through more frequent attorney-generated notice letters, and (2) to sell a service to the attorney which would ensure more accurate communication with the current owners, improve recordkeeping, and and provide the attorney administrative assistance in processing the letters as the numbers increased. The creation of this service was also to make money. Abshier stated that "attorneys' fees [were]…a possible revenue stream. The concept was developed that if you could provide some value to the attorney, that…you could capture some of what the attorney was owed. Particularly, we were already doing all of the work developing the spreadsheet for the attorney to do the mail merge…" W. Abshier depo., p. 24.

Abshier also testified that another area they considered to offer a potential revenue stream was the sale of a product designed to add value to the attorneys performing foreclosure work for the third-party purchasers. W. Abshier depo., p. 51. Third-party purchasers are prohibited from foreclosing on the liened property until one year from the date of issuance of the certificate of delinquency. In the event payment is not made as a result of notice collection efforts, foreclosure on the property is the final remedy available to the third-party purchaser in order to obtain payment on the debt. A notice letter is required to be sent to all interested parties forty-five days prior to institution of foreclosure proceedings. Abshier explained how the concept of BGA's title services came about:

> We started some foreclosures to see how the process worked. We just gave them to Virginia Lawson. I said here, do with it whatever you need to do to foreclose, and we're going to learn from this process. I believe it was something like 100 liens. So she followed the notice requirements, sent the preforeclosure notice letter. She would run title on the property. She would…notice everybody on the title and continue from there. And we would just monitor the process. Most of them paid off when they got notice or other lienholders…would pay off. This is when we really confirmed that so many of these tax liens had been missed in title searches because we had a lot of payoffs from title companies at this point. And from that experience of those hundred liens, we…sat down and looked and said,

all right, based on our experience with the prelitigation fees, is there anywhere in this area that we can provide a service? Well, the only point in that process that there was a third party involved, was they were already farming out the title searches to third parties. If we gave them 100 foreclosures at once, they decided, look, we only have X number of attorneys in-house, that's a lot of work. We're going to go ahead and farm out the title searches. We said, well, if they are already farming out title searches, what does it take for us to create a title company and do that for them? It's very similar work to what we were already doing in the courthouses. We were already familiar with these properties. We already had people that were mostly trained in that area. We knew we had some vendors that were not going to be able to do title searches, but we thought we could staff up to do this. It was just another vendor management project for us at that point. So the idea was if we contract with the attorney, they're going to have to…have to do the steps of getting a title search right off, and we think we can provide that service…We would subcontract with another title company. Get the title. Bring it back into our office. We would do what we were going to do with it and then upsell that to the attorney…The idea was sort of twofold, as I recall these discussions. That the two major components that we could handle were just sheer volume, because, again, it was a vendor management issue. If we were going to be doing…hundreds of foreclosures at a time, that was a real constraint on our attorneys to be able to get these all out to any sort of pipeline. And then on top of that,…the service we wanted to provide was a vetting service where we would not only provide feedback to any subcontractors we had in terms of, you know, we don't think your information's complete, but then we would do additional work on top of that for – if it was a company we needed to get…the secretary of state web page and get their information to – it's one thing to know whom. It's another to know how to serve someone. And so…any time we did not have the how, it was the responsibility …of our people to try to come up with the how. We would take all that information, put it into the format requested by the attorneys. And it was a propriety [sic] format worked out between Blue Grass Abstract and the attorneys….Skip tracing as well…It was the…idea that it was…not wasted time, but it was…not something that had to be done by attorneys. It was…back-office work. It was not attorney work. We didn't want our attorneys working on that portion of it…We were just getting a flat title fee from all of our attorneys.

W. Abshier depo., pp. 51-55.

In 2007, the concepts became a reality. LDS and BGA were formed and Gulledge tasked Billy Abshier's wife to find an attorney in Kentucky who was interested in an engagement to represent the third-party purchasers, with LDS providing PVA search services, data management and clerical services for fifty-day and all other notice letters. Catherine Abshier stated in her

deposition that she contacted between 12 and 15 attorneys about the arrangement. Sherrow Sutherland & Associates expressed interest, and Trey Gulledge and Sharrow formalized the agreement. C. Abshier depo., p. 42-43. Catherine Abshier stated in her deposition that the attorney "would retain $5" for every letter sent. The plaintiff reads this testimony to indicate that there was only one transaction and Sharrow was to retain $5 from it. Abshier later confirmed that Sharrow's initial engagement letter indicated that he would be paid $67.50 per letter, and the initial vendor agreement between Sherrow and LDS required Sharrow to pay LDS $62.50 per letter. *Id*. at 44. Despite the "$5 spread," these were not one transaction, but rather separate engagements requiring separate payment as between the parties. There is no suggestion that these formal distinctions were disregarded. The plaintiffs note that, according to Catherine Abshier, this concept of attorney work utilizing LDS services was presented to Sherrow with the suggested pricing. This was not however, a contract of adhesion. Sherrow had no obligation to accept the terms offered, but he did so, and agreed to represent the third-party purchasers. There is no evidence that the initial price of $67.50 was arbitrary. Billy Abshier testified that the intent was to reduce the price of a notice letter to amount less than the $75 that Lawson had charged. The price per letter which was charged by LDS reflected the yeoman's share of work performed by LDS for Sherrow.

Gulledge testified concerning their expectations for Sharrow's representation:

So with Sharrow, the idea was…that…we were going to be providing a service to the attorneys and we wanted them to do what they were comfortable with, but at the same time we want the attorneys to spend time doing their legal work that couldn't be provided by I'll say the private sector. So…it doesn't make sense for me in my mind as a business person to think of Billy Sherrow trying to find somebody in Perry County to go into the PVA office and pull however many PVA cards and to match the PVA card to the certificate of delinquency and make sure those match and to find the right contractor and make sure they show up for work and then review their work product and then find a mail house and negotiate the best price for the mail house and negotiate a price for the contractor. I mean,

there's a whole host of things that are more business oriented and logistical and not so much legal. So a big part of LDS's business plan was to take that off the plate of the attorney to handle things that were nonlegal in nature and to have the attorney review the work product to make sure it met their satisfaction and to do the follow-up with the questions that came through.

Gulledge depo., pp. 62-63. He testified that the verification of PVA information had been expected of Lawson, as well, although there was apparently no written contract with her. He stated "It was her job or any attorney's job we were providing services for to verify that the quality of the work that was being provided was worthy of having their name on the letterhead. Gulledge depo., p. 64. He went on to state that "I do recall conversations with Billy Sherrow about the responsibility on him for auditing a certain percentage of the letters and the data that was provided by LDS, and I'm virtually certain that he did audit some percentage of those letters." Gulledge depo. pp. 65-66.

The plaintiffs' assert that Sherrow must not have done any reviewing of letters while engaged as counsel because he stated in his deposition that he could not say whether one particular batch of letters, sent to him in a .zip file on March 5, 2009 and returned for mailing very quickly thereafter, had been reviewed by him. Billy Abshier testified that he was certain that Sherrow did verify a percentage of the information for accuracy, "[b]ecause I did receive e-mails rejecting certain batches, saying…hey, we think we may have a problem on this one, or, hey,…I looked this guy up and I don't think this is right. We did---I did experience that on occasion. Was it 10 percent? Was it 1 percent? Did he just get a phone call about it? I don't know what the impetus for that was, but I do know that I would get some rejects." W. Abshier depo., p. 36. Gulledge testified that "early on, I would expect a much more thorough review process. Early in the relationship I would expect a much higher level of review than a couple of

years into the relationship when the quality and the process had been proven out and the quality was evident." Gulledge depo., p. 67. Sharrow confirmed that this was, indeed, the case:

> I was simply concerned with the content of the letter – the accuracy of the letters…I became confident that their data was accurate…I had a high interest in passing along information—if I got communication that indicated that information on a letter was incorrect for any reason, then I had a high degree of interest in passing that along so that the mistake would not be repeated, whether it was their mistake or a mistake in the county's records.

Sharrow depo., p. 147.

Sharrow testified as to what he understood his firm's responsibilities to be, and what he did in that representation. He was asked to, and did, review and approve letters that were being used to ensure compliance with the statutes. He drafted his own form of a statutorily-compliant fifty-day letter. All letters which were assembled by LDS were generated at his specific request, they were approved by him after they were produced, and they went out over his signature and on his letterhead. According to Cathy Abshier, a sequence of progressively more aggressive notice letters was drafted by her and reviewed by Sharrow.

The plaintiffs make much of the fact that this series of letters, sent out over a long period of time, did not aggressively demand payment until the last letter which was sent prior to the forty-five-day preforeclosure notice. First, the plaintiffs have not identified any constraints on the business model which may be employed by the third-party purchaser in approaching owners and securing payment of delinquent taxes. In any event, the plaintiffs' argument that the sending of a series of notice letters through Sharrow was a sham to run up the prelitigation attorneys' fees does not ring true in light of the testimony of Billy Abshier that this was a principled approach to actively and effectively utilize the prelitigation period. Sharrow confirmed this notion, stating that "I think there's an expectation that if [the property owners] kept getting letters, it's not going away." Sharrow depo., p. 144. The Abshiers and Gulledge testified, however, that this plan met

the dual purposes of encouraging prelitigation redemptions and creating a revenue stream for LDS. As already stated, LDS' work was within the realm of attorney Sharrow's work product, and the accrual of prelitigation attorneys' fees for letters generated at his request is limited only by the caps contained in KRS 134.452.

Sharrow indicated that he took responsibility for the content of the letters, and he paid LDS in full for the notices that went out, regardless of whether the full amount of the notice was collectable from the property owner. Sharrow deo., p. 136. He stated unequivocally that his firm received the full amount of whatever it charged TELS or TELI and he paid the vendors' bills in full. *Id.*, p. 137.

There was also testimony concerning the extent of the post-notice follow-up work that was required by his firm, despite the fact that Sharrow Sutherland's phone number did not appear on the letters. As the number of liens increased, Sharrow was required to dedicate the time of other firm employees to fielding phone calls and drafting responsive letters. *See,* Sharrow Affidavit, DN 163-26. Additionally, the evidence established that certain costs were passed through 100%, as in the case of a preforeclosure PVA check which would appear as a line item denominated LDS- County PVA, but its value to Sharrow was reflected in the content of the forty-five-day letter that was then sent out. Sharrow depo., p. 133. He stated that the forty-five-day letter "was an important letter because it was a requirement for filing the lawsuit. And, of course, if it went to the wrong party, then obviously that created a substantial issue." *Id.* at p. 151. Thus Sharrow expected LDS to do a PVA check before the letter went out. He indicated that as a result of LDS's work and information from the title report, he had a high degree of confidence that the foreclosure complaint that was filed was accurate. *Id.* at p. 153.

We additionally note the timing of events after certificates of delinquency were obtained by the third-party purchasers:

> So at the beginning of whatever month, [TELS/TELI] would send a list to Billy Sherrow or whoever was handling the letters…say we need letters on this. He would then contract LDS, which was Michelle [Le], and she would then do all of what I just described. And then we would send it to the attorney. And when it was completed and then the attorney would review and approve. As soon as they approved it, it came back to LDS, and then they managed the…vendor that did the mailing. [O]nce that happened, it was also recorded in our database…

Andrea Nicole Russolillo depo., p. 22.

The plaintiffs contend that the defendants may not collect the statutory maximum allowed for prelitigation attorneys' fees without the rendering of actual legal services in prelitigation collection efforts. The evidence adduced by the defendants establishes an attorney-client engagement between the third-party purchaser, TELS or TELI, and attorney Sherrow whereby work was performed and value added for the benefit of the third-party purchaser. Actual written engagement agreements were created to memorialize these relationships, *see* DN 173-13, PageID #5963-64; DN 173-14, PageID #5965-67, although signed copies of the agreements have not been produced. Regardless, Gulledge testified as to the third-party purchaser's expectation of Sharrow in that representation. Sharrow testified as to the legal services he provided to the third-party purchaser in assisting with the plan to prompt delinquent taxpayers through a series of notices to make payment of their tax debts during the prelitigation period. The evidence also establishes the existence of a separate attorney-vendor agreement in which LDS provided actual services of value to Sherrow in his rendering of legal services to his clients TELS and TELI. The plaintiffs contend that the defendants engaged in an illegal sleight of hand when LDS received payment for services which TELS or TELI earlier provided for free. It similarly contends that the new PVA records research service developed by LDS could be performed for

free.  The plaintiffs therefore argue that Sherrow took $5 per letter to permit billing and payment for LDS' services to flow through his account so the purchaser could label the payment as an "attorney's fee."  The problems with this argument are that (1) actual services sought by Sharrow in accomplishing his representation of the third-party purchaser were provided by LDS, a separate and distinct legal entity from the third-party purchaser, (2) LDS billed Sharrow for those services, (3) Sharrow approved of and utilized LDS' work product in his attorney work product for the benefit of the third-party purchaser, and (4) Sharrow paid LDS's bill.  LDS' fees and costs were incorporated into the fee Sharrow then billed to the third-party purchaser.  That prelitigation attorneys' fee was then added to the tax debt pursuant to the statute.

The plaintiffs also contend that this cannot possibly be a legitimate arrangement, as 90 to possibly 100% of the attorneys' fee charged by Sharrow to the third-party purchaser represented the cost of work done by LDS.  This argument fails inasmuch as there has been no showing that LDS did not do the work for which it billed Sharrow nor has there been a showing that the LDS' work was not work which could properly be incorporated into the value of Sharrow's attorney work product. LDS apparently performed the yeoman's share of the work in the prelitigation collection efforts for which it billed Sharrow.  The court does not find any evidence of sleight of hand taking place in this case.  As we have said repeatedly, the analysis remains unchanged by the plaintiffs' rhetoric that money was being "run through" Sharrow's account or was being "paid back" to "the defendants."  The statute permits the third-party purchaser to engage the services of an attorney and incur attorneys' fees which are for actual services performed in prelitigation collection efforts which are reasonable under the circumstances.  The third-party purchasers' plan to send more notices, at a relatively modest cost per letter, over time, in an attempt to encourage recalcitrant taxpayers to pay their debts is certainly reasonable.  The fact

that the process also benefits an affiliated business of the third-party beneficiary is of no significance, the plaintiffs' incessant beating of the drum that the money was just "given back to Tax Ease" notwithstanding.

There is ample virtually uncontroverted evidence of actual attorney work performed by Sharrow and his vendor, LDS. For the reasons explained herein, no chink in the armor of testimony concerning the services provided by these parties has revealed any a genuine issue of material fact. The court has addressed and rejected plaintiffs' arguments that the prelitigation attorney's fees were unreasonable because (1) LDS was an affiliated entity owned by TEH, (2) neither Sharrow nor LDS provided valuable services, (3) Sharrow did not exercise any oversight over the work of LDS, (4) the plan to increase the frequency of letter notices was intended to generate a profit, and (5) the maximum collectible amount of prelitigation attorney's fees was often reached, significantly increasing the amount of the tax burden. We conclude that the plaintiffs have failed to controvert the evidence that the third-party purchasers incurred actual reasonable prelitigation attorneys' fees through prelitigation collection efforts. Our conclusion is bolstered by defendants' evidence that these fees have been approved by Kentucky courts in past litigation, and by the Kentucky legislature's recent acknowledgment that actual prelitigation attorneys' fees falling within the statutorily approved maximums are presumed reasonable.

Nicole Compary, former manager and the individual tasked with the start-up of BGA, testified concerning how BGA operated and what value it brought to the attorneys with its title report product. She testified:

> I became the manager of Blue Grass Abstract…The concept I was told was to be the title provider for the foreclosure attorneys that were going to start foreclosing on tax liens Tax Ease was having trouble collecting on…So they explained to me that my duties would be to find the title abstractors, set up a network of title abstractors within the state for statewide county coverage. I set up the forms for the cover sheet that we put together for the foreclosure package that we sent to the

foreclosure attorneys. I spoke with the foreclosure attorneys regarding their needs and what…they needed on that form. I sent invoices to the foreclosure attorneys for the title reports. And then as we grew, I hired and trained employees to vet the title searches…I had a pretty good general working knowledge of mortgage and title from my jobs up to that point…We always did the vetting process where we put together the report…We would make sure the correct property was searched. We would compare our tax bill with the legal description or whatever information we had from the abstract that we got back…If there wasn't a current mailing address or the correct owner, or if there were other owners, heirs, what have you, we would skip trace those people and try and provide the attorneys with correct mailing addresses. And then we would look up for any of the interested parties, mortgage companies, what have you, we would look up their registered agent, the secretary of state, and provide that information to the foreclosure attorney.

Compary depo., pp. 7-9, 15-16. Larry Evans, Operations Manager who had some oversight responsibility for the performance of BGA and LDS, confirmed in his deposition testimony that BGA clearly added value to the raw abstracts through its vetting process. He testified that the value of the upcharged title report to the attorneys was that BGA evaluated the information, ensured it was all there and filled in any gaps in the process, if necessary going back to its vendor to obtain further information, organized and summarized the materials in a clean, repeatable format for the attorney. Evans depo., p. 105. Compary testified that the attorneys would be billed $400 for the title report. There are billings of $300 and $400 in the record. Gulledge testified that he determined that the price for the title report was reasonable because "This is what the market would bear." Gulledge depo., p. 68. In response to the challenge of the plaintiffs that the price was unreasonably marked up due to the availability of the abstracts for an average of $100, Gulledge stated "I don't care what product I'm selling, if the raw material costs a certain amount, there has to be a margin there. And not only a margin, but the raw material, the abstract, plus all the other things I described, you have to add those together, add your margin. Otherwise why would you be in business?" Gulledge depo., p. 81. Attorney Eric Craig

who did foreclosure work for the third-party purchasers, testified that "I think in general we were getting more value than we were paying BGA. And actually I can tell you that for fact…we had vendors out there that were charging us over $500 for the same exact titles and giving us less product, less analysis, less review." Craig depo. p. 130. The evidence shows overwhelmingly that BGA performed actual work in vetting the raw information and putting together a title report product which was of value to the attorneys in the foreclosure process. The plaintiffs' argue that BGA did not do enough to the raw materials to warrant a claim that actual work was performed, and that it did not do its work well enough, *ie*. there were errors, and therefore it could not justify charging a fee of $300 or $400 for these reports. However, to be entitled to collect attorneys' fees, the third-party purchaser need only show that actual work was performed for a fee which was reasonable under the circumstances. There is no question that BGA performed actual work, despite the plaintiffs' criticism that the work did not amount to much. The plaintiffs' opinion of the value of BGA's work is irrelevant. It is the value to the attorneys that is critical, and clearly there was value added here. The errors in BGA's billings did not, as the plaintiffs suggest, evidence that the entire operation was a sham. Rather, the error was an internal auditing error which, when caught by Compary, cost her her job. Compary depo., pp. 23-24.[5]

We find that the BGA's title report fee was for actual work performed for the benefit of the foreclosure attorneys and that the $300 or $400 fee charged to them was reasonable in light of the fact that such a title report fee has been approved by Kentucky courts as well as courts in other jurisdictions. *See, Smith v. Tax Ease Lien Investments 1, LLC*, No. 2014-CA-000982-MR, 2015 WL 7573833 (Ky.App. Nov. 25, 2015); *Beck v.Codilis & Stawiarski, P.A.*, No. 4:99CV-485-RH, 2000 WL 34490402 (N.D.Fla. Dec. 27, 2000), at least one attorney who actually

---

[5] Cathy Abshier also discovered a significant number of errors over a period of time at LDS where bills reflected fees for notices that had not been sent out. Again, Abshier discovered that the errors were due to a personnel issue rather than flaws in the company's infrastructure.

purchased the product in Kentucky believed he was receiving good value for the money for use in the foreclosures (Craig depo., p. 130). Tellingly, plaintiffs have offered no contrary evidence that the BGA title fee was not actual and reasonable.

## III.

The named plaintiffs in this action have each articulated some discrepancy in the fees added to their tax bills, that bogus title report fees were added, or in the case of Cambron and Branson, that the prelitigation attorneys' fees exceeded the statutory maximum allowed to be added their debts. All of the plaintiffs knowingly and voluntarily resolved their tax delinquency in some fashion. (forebearance agreement executed by Brown, Fst.Am.Compl. ¶ 133; agreed judgment executed by Cambron, ¶145; payment in full by Leigh and Third Century Development Corp., ¶154; agreed judgment entered into by Branson, ¶ 169). Plaintiffs are therefore bound by their judgments, absent a successful claim for fraud or misrepresentation upon which they relied in settling their claims. As noted at the outset of this opinion, all of the claims are premised upon the contention that the defendants joined together in formulating two schemes to fraudulently claim fees that were not actual and reasonable attorneys' fees. Summary judgment in favor of the defendants defeats all claims in the First Amended Complaint, as each requires proof of misrepresentation or fraud (Counts 1 and 2 – RICO; Count 4 – Fraud and Conspiracy to Commit Fraud; Count 5 – Fraudulent Inducement and Conspiracy to Commit Fraudulent Inducement), a violation of KRS 134.452 (Count 3 – Damages Pursuant to KRS 446.070 and Conspiracy to Violate KRS 446.070), or a wrongfully obtained benefit (Count 7 – Unjust Enrichment). As the

underlying premise of the action has been found wanting, the First Amended Class Action Complaint must be dismissed.

A separate order will be entered this date in accordance with this opinion.

March 30, 2018

**IT IS SO ORDERED.**

**Charles R. Simpson III, Senior Judge**
**United States District Court**